UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

WACO DIVISION

WACO, TEXAS

FILED

APR 2 5 2016

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY _____
                    DEPUTY

YOLANDA SALDIVAR, TDCJ #733126 §
§
    Petitioner §
§
v. §
§
WILLIAM STEPHENS, DIRECTOR §
§
    TDCJ-ID §
§
MELODYE G. NELSON, WARDEN §
§
    TDCJ-ID §
§
WHITNEY FRANKS, ASST. WARDEN §
§
    TDCJ-ID §
§
UTMB, CONTRACTOR §
§
    TDCJ-ID §
§
    Defendants §

Complaint Civil Action

No. _____ W16CA095

## PETITIONER'S MOTION FOR LEAVE OF COURT TO FILE

## A MEMORANDUM IN SUPPORT OF PETITIONER'S

## §1983 FEDERAL CIVIL LAWSUIT

### I.   JURISDICTION AND VENUE

1.  This is a civil action authorized by 42 U.S.C. section 1983 to redress

the deprivation, under color of state law, of rights secured by the

Constitution of the United States.   Petitioner brings this action under §1983

Federal civil lawsuit and files a motion for leave of court to file a

memorandum in support of Petitioner's §1983 Federal civil lawsuit.   The

Court has jurisdiction and venue under 28 U.S.C. section 1331 and 1343(a)(3).

Therefore, the Petitioner seeks monetary compensatory and punitive

damages pursuant to Federal Rules of Civil Procedure Rule 54.

2.  The Western District is an appropriate venue under 28 U.S.C. section 1391(b)(2) because it is where the events giving rise to this claim occurred.

## II.  PETITIONER

3.  Petitioner, Yolanda Saldivar, is and was at all times mentioned herein a prisoner of the State of Texas in the custody of the Texas Department of Correction.  She is currently confined in the Mountain View Unit in Gatesville, Texas.

## III.  DEFENDANTS

4.  Defendant, William Stephens, Director of the State of Texas Department of Corrections.  He is legally responsible for the overall operation of the Department and each institution under its jurisdiction, including Mountain View Unit.

5.  Defendant, Melodye G. Nelson, is the Warden of Mountain View Unit.  She is legally responsible for the operation of Mountain View Unit and for the welfare of all the offenders in that prison.

6.  Defendant, Whitney Franks, is a correctional officer of the Texas Department of Corrections who, at all times mentioned in this complaint, held the Rank of Assistant Warden and was assigned to Mountain View Unit.

7.  Defendant, University of Texas Mary H. Baylor Medical, is a contractor of the Texas Department of Correction who, at all times mentioned in this complaint, provides medical and dental services for all offenders assigned to the Mountain View Unit.

## IV.  ARGUMENT AND AUTHORITIES

### GROUNDS FOR REVIEW No. 1

### PETITIONER'S FEDERAL CONSTITUTIONAL

### EIGHTH AND FOURTEENTH RIGHTS WERE GROSSLY

VIOLATED BY THE DELIBERATE INDIFFERENCE OF PRISON OFFICIALS

United States Code, Title 42, section 1983 reads as follows:

> "Every person who, under color of any statute, ordiance,
> regulation, custom, or usage, of any state or territory
> or the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation
> of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured
> in an action of law, suit in equity, or other proper
> proceeding for redress...".

Petitioner asserts and will prove to this Court that the person(s)

mentioned in this civil action above operating under color of state law,

deprived and violated Petitioner's rights secured by the Constitution of

the United States.  The Eighth Amendment of the United States Constitution

states:

> "Excessive bail shall not be required, nor excessive
> fines imposed, nor cruel and unusual punishments
> inflicted".

The Federal Constitution's Eighth Amendment which applies to the states

through the due process clause of the Fourteenth Amendment, outlaws and

prohibits the infliction of cruel and unusual "punishments" not "conditions"

on those convicted of crimes.  **FARMER V. BRENNAN**, 511 US 825, 128 L.Ed.2d 811,

114 S.Ct. 1970; Crim Law §77; **ROBINSON V. CALIFORNIA**, 370 US 660, 666, 9 L.Ed.

2d 758, 82 S.Ct. 1417 (1962).  An intent requirement is either implicit in the

word "punishments" or is not; it cannot be alternately required and ignored as

policy considerations might dictate.  **WILSON V. SEITER**, 501 US 302 (1991).

"An express intent to inflict unnecessary pain is not required, **ESTELLE V.**

**GAMBLE**, 429 US 97, 104 [50 L.Ed.2d 251, 97 S.Ct. 285] (1976) ('deliberate

indifference' to a prisoner's serious medical needs is cruel and unusual

punishment), and harsh 'conditions of confinement' may constitute cruel and

unusual punishment unless such conditions 'are part of the penalty that

criminal offenders pay for their offenses against society', RHODES V. CHAPMAN, 452 US 337, 347 [69 L.Ed.2d 59, 101 S.Ct. 2392] (1981)".  "After incarceration, only the unnecessary and wanton infliction of pain... constitutes cruel and unusual punishment forbidden by the Eighth Amendment". To be cruel and unusual punishment, conduct that does not purport to be punishment at all must involve more than ordinary lack of due care for the prisoner's interest or safety...It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the cruel and unusual punishments clause...WHITLEY V. ALBERS, 475 US 312, 319, 89 L.Ed.2d 251, 106 S.Ct. 1078.  "The infliction of punishment is a deliberate act intended to chastise or deter...DUCKWORTH V. FRANZEN, 780 F.2d 645, 652 (CA & 1985)".

    The Constitution "does not mandate comfortable prisons", RHODES V. CHAPMAN, 452 US 337, 349, 69 L.Ed.2d 59, 101 S.Ct. 2392 (1981), but neither does it permit inhumane ones, and it is now settled that "the treatment a prison receives in prison and the conditions under which he is confined are subject to scruting under the Eighth Amendment".  HELLING V. McKINNEY, 509 US at 31, 125 L.Ed.2d 22, 113 S.Ct. 2475.  In its prohibition of "cruel and unusual punishments", the Eighth Amendment places restraints on prison officials who may not, for example, use excessive physical force against prisoners.  HUDSON V. McMILLIAN, 503 US 1, 117 L.Ed.2d 156, 112 S.Ct. 995 (1992).  The Eighth Amendment's ban on inflicting cruel and unusual punishment, 'proscribe[s] more than physically barbarous punishments', ESTELLE V. GAMBLE, 429 US 97, 102 [50 L.Ed.2d 251, 97 S.Ct. 285] [(1976)].  It prohibits penalties that are grossly disproportionate of the offense WEEMS V. UNITED STATES, 217 US 349, 367 [54 L.Ed. 2793, 30 S.Ct. 544] [(1910)], as well as those that trangress today's '"broad and idealistic concepts of dignity,

civilized standards, humanity and decency'". **ESTELLE V. GAMBLE**, supra, at

102 [50 L.Ed.2d 251, 97 S.Ct. 285], quoting **JACKSON V. BISHOP**, 404 F.2d 571,

579 (CA 8 1968). "Confinement in a prison or in an isolation cell is a form

of punishment subject to scrutiny under the Eighth Amendment Standards".

**Id**. at 685, 57 L.Ed.2d 522, 98 S.Ct. 2565. The Amendment also imposes duties

on these officials who must provide humane conditions of confinement; prison

officials must ensure that inmates receive adequate food, clothing, shelter,

and "**MEDICAL CARE**" and must "take reasonable measures to guarantee the safety

of the inmates". **HUDSON V. PALMER**, 468 US 517, 526-27, 82 L.Ed.2d. 393, 104

S.Ct. 3194 (1984).

To challenge prison conditions using the Eighth Amendment, you must meet

both "OBJECTIVE" and "SUBJECTIVE" requirements. **FARMER**, supra, 511 US 825,

(1994); **WILSON V. SEITER**, 501 US 294 (1991). To meet the "OBJECTIVE" Eighth

Amendment standard, you need to show that you were deprived of a basic human

need or exposed to serious harm. Under the "SUBJECTIVE" part of the test, you

must show that the prison official you are suing knew you were being deprived

or harmed and did not respond reasonable. You must also show how you were

injured and prove that the denial of a basic need caused your injury. **Id**. at

825. A Constitutional violation occurs only where the deprivation alleged is,

OBJECTIVELY, "sufficiently serious", **WILSON V. SEITER**, 501 US 294, 298, 115

L.Ed.2d 271, 111 S.Ct. 2321; a prison official's act or omission must result

in the denial of the "minimal civilized measure of life's necesities", **RHODES**,

supra at 347, 69 L.Ed.2d 59, 101 S.Ct. 2392; In **BARNEY V. PULSIPHER**, 43 F.3d

1299, 1311 (10th Cir. 1998), the Court will look at whether the condition or

conditions you are challenging could seriously affect your health or safety.

In considering a condition, a court will think about how bad it is and how long

it has lasted. You must show that you were injured either physically or

psychologically, though courts do not agree on how severe the injury must be. You may challenge conditions even without an injury if you can show that the condition puts you at serious risk for an injury in the future. **HELLING V. McKINNEY**, 509 US 25 (1993); and the official has acted with "**DELIBERATE INDIFFERENCE**" to inmate health and safety. Under the SUBJECTIVE part of the test, you must show the official you are suing acted with "DELIBERATE INDIFFERENCE". **WILSON**, supra. This is an important legal term. "DELIBERATE INDIFFERENCE" is appropriate only in "cases involving personal injury of a physical nature". **WILSON**, 501 US 303. It means that the official knew of the condition and did not respond to it in a reasonable manner. **FARMER**, at 825. One way to show this is by proving that the condition was so obvious that the official must either know about it or be purposefully ignoring it. As **WHITLEY V. ALBERS**, 475 US 312, 319, 89 L.Ed.2d 251, 106 S.Ct. 1078 teaches, the "**WANTONNESS**" of conduct depends not on its effect on the prisoner, but on the constraints facing the official. Courts will also consider any complaints or grievance reports that you or other prisoners have filed, **VANCE V. PETERS**, 97 F.3d 987 (7th Cir. 1996), as well as prison records that refer to the problem. Prison officials cannot ignore a problem once it is brought to their attention. **ASHFORD V. UNITED STATES**, 511 F.3d 501 (5th Cir. 2007). A prison official must have a "sufficiently culpable state of mind". **HUDSON V. McMILLIAN**, 503 US 1, 117 L.Ed.2d 156, 112 S.Ct. 995 (1992). In **ESTELLE** at 106, 50 L.Ed.2d 251, 97 S.Ct. 285, the Court distinguished "DELIBERATE INDIFFERENCE" to serious medical needs of prisoners...from "negligen[ce] in diagnosing or treating a medical condition", holding that only the former violates the clause. The Court held that the denial of medical care is "CRUEL AND UNUSUAL" because in the worse case, it can result in physical torture, and, even in less serious cases, it can result in pain without any penological purpose and

-6-

the Court also held that it is satisfied by something less than acts of omissions for the very purpose of causing harm or with knowledge that harm will result. **ESTELLE**, 429 US at 103. With "DELIBERATE INDIFFERENCE" lying somewhere between the poles of negligence at one end and purpose or knowledge at the other, the Court of Appeals have routinely equated "DELIBERATE INDIFFERENCE" with recklessness. **LaMARCA V. TURNER**, 995 F.2d 1526, 1535 (CA 11 1993); **MANARITE V. SPRINGFIELD**, 957 F.2d 953, 957 (CA 1 1992). It is indeed, fair to say that acting or failing to act with "DELIBERATE INDIFFERENCE" to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk. The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known. See **PROSSER AND KEETON** §34, pp 213-214, Restatement (2nd) of Torts §500 (1965). In **FARMER V. BRENNAN**, 511 US 825, 128 L.Ed.2d 811, 114 S.Ct. 1970, the Court held that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. In **WEST V. ATKINS**, 487 US 42 (1988), the Supreme Court held that for a constitutional medical care claim, a prisoner needs to prove that he or she had a serious medical need and that the guard or doctor in question acted recklessly in failing to provide medical care.

The Petitioner does not and is not submitting an argument(s) about her confinement or mandating a comfortable prison. But rather submits an argument of an inhumane prison practice imposed upon her where her health and safety were compromised causing her to have a head injury. Furthermore, medical care

post head injury was denied to the Petitioner for 10 days and, only after her condition got progressively worse, that the required medical attention was provided. Reasonable measures to guarantee the safety of the Petitioner and the denial of medical care are arguments that the Petitioner sets forth to this Court when her constitutional rights required by the Eighth and Fourteenth Amendments of the Constitution of the United States which imposes upon prison officials to provide every prisoner were grossly violated. The Petitioner now brings to the attention of this Court the **FACTS** as they occurred that led to the violation of these Constitutional Rights:

## V. FACTS

### WEDNESDAY, MAY 20, 2015

Mountain View Unit houses Protective Custody (Now Protective safekeeping) offenders in E-Dorm building. The Petitioner, in regards to this particular incident in question, was assigned to cell #1. At the time in question, another offender, Offender Trump, was assigned to cell #5 during which she was having trouble with her toilet functioning properly. Maintenance was informed of the problem and told the officer, Ms. Aguirre, that he would come to E-Dorm after lunch. HE DID NOT. The plumbing problem continued and at around 5:00 p.m., Officer Coble informed Sgt. Briggs about the situation. Sgt. Briggs, after verifying the problem, informed Lt. Hocutt, and Offender Trump was moved to cell #1, BOTTOM BUNK BED, where the Petitioner was assigned and the Petitioner was then moved to cell #2, a TOP BUNK BED. A TOP BUNK BED is 60 feet or so off the ground. The Petitioner informed Sgt. Briggs that she had a BOTTOM BUNK BED restriction. She checked with the countroom and medical for any restrictions, but there was none. TDCJ records will show that when Protective Custody offenders were moved in 2009 from administrative segregation building wing one to E-Dorm building, the Petitioner was assigned to a BOTTOM BUNK BED. NOT ONCE was the Petitioner placed in a TOP BUNK BED until the date in question. And this was because Ms. Blanchard and Ms. Williams from Classification placed a notation in the Petitioner's travel card (as verified by Mr. Graham/grievance department) indicating that if offenders were below a certain height, you were assigned a BOTTOM BUNK BED restriction. Mr. Graham related this to the Petitioner. Offender Trump is 59 inches tall, is not on any medications at the time in question and had a BOTTOM BUNK restriction given by Ms. Blanchard and Ms. Williams. The Petitioner is 58 inches tall, takes Lopressor for heart palpitations, Levothyroxine for her thyroid, Hydrochlorothiazide for swelling to her feet and Prilosec for her stomach. **(See Exhibit A – Medical Pill Pass)**. Yet, Offender Trump is given a restriction for a BOTTOM BUNK BED **(NOT BY MEDICAL)** while the Petitioner with her height of 58 inches and health issues is

-8-

denied a BOTTOM BUNK BED and instead given a TOP BUNK BED. When Mr. Graham asked Ms. Williams about the discrepancy between these two offenders and bed assignments, he said Ms. Williams stated to him that notes on travel cards were not policy. Therefore, the BOTTOM BUNK restriction was not enforceable. Yet, for a period of 6 years, TDCJ recognized the safety hazard a TOP BUNK BED posed to the Petitioner as she was NEVER assigned to one until the date in question. In addition to this and before the Petitioner was moved to cell #2, Officer Coble and/or Sgt. Briggs FAILED to check the cell for PROPER FUNCTIONING such as for running water. Cell #2 had not been occupied for many years. The Petitioner tried to informed Sgt. Briggs that there was no running water including that she could not reach up or climb up and down from the TOP BUNK BED because of her height and that the cell required massive cleaning requiring some running water to do so. The Petitioner made many complaints to Officer Coble about being assigned to an unfunctional cell. The Dorm had no air conditioning and the temperature outside was above 90 degrees and the Petitioner had no running water. Officer Coble stated that she had informed Rank but that nothing would be done to move the Petitioner, leaving her in an unfunctional cell. Every offender has a right to running water, a basic human need. Officer Coble recognizing the Petitioner's need for water, rigged the water pipes in order for the Petitioner to have some running water and it ran continuously, non-stop. She also called medical about a medical restriction for a BOTTOM BUNK BED. Nurse Fox informed her that the Petitioner had a BOTTOM BUNK BED restriction which had expired on November, 2013. The Petitioner "FEARING" she might fall from her TOP BUNK BED, opted to sleep sitting on her stool and laying her head on the table.

### THURSDAY, MAY 21, 2015

The Petitioner informed administrative segregation Sgt., Sgt. McGill, about the cell change and her difficulty climbing up and down the TOP BUNK BED. Sgt. McGill stated she would talk to medical and Ms. Blanchard. The Petitioner also spoke to Nurse Williams who was making rounds and he informed her that he would check on her medical records as to why the BOTTOM BUNK BED restriction was expired. He called later and informed Officer Nunn that the Petitioner's restriction expired because it was not indefinite. Nevertheless, that there had been a restriction. The Petitioner sent an I-60 form to medical requesting a BOTTOM BUNK BED restriction. **(See Exhibit B − I-60 form)**. On second shift, Officer Robinette was informed by Lt. Evans that the Petitioner had no restrictions for a BOTTOM BUNK BED and therefore would not be moved despite her height. Maintenance failed to show up for a second day to fix the water pipes. The sink water continued to run continuously. The Petitioner having no choice and after a sleepless night, "FORCED" herself to get on the TOP BUNK BED to sleep.

### FRIDAY, MAY 22, 2015

At 4:00 a.m., as the Petitioner was awoken for breakfast by Officer Griffin, the Petitioner was attempting to come down from the TOP BUNK. Ms. Griffin witnessing the difficulty the Petitioner was having

descending, voiced concern for the Petitioner's safety and well-being. As the Petitioner stepped onto the floor, the floor was flooded with water as well as cells #1 and #3. When Ms. Kuzenka arrived on first shift, she called maintenance and informed Lt. Evans about the flooding and the sink water running continuously. Maintenance refused to show up. Offender Trump, now in cell #1 was also having plumbing problems, called her mother at home who then called Warden Nelson about this issue with maintenance not arriving to fix the problems. A long Memorial Day weekend was approaching during which time maintenance would be off of work and these problems would be left unattended. No later than 15 minutes after this call to the Warden, that maintenance showed up and (within another 15 minutes) the pipes were fixed including cell #5, a BOTTOM BUNK BED. At this time, the Petitioner requested to be moved, but her request was DENIED. Still, the Petitioner continued to have trouble climbing up and down from her TOP BUNK BED.

### TUESDAY, MAY 26, 2015

At 4:30 a.m. third shift officer, Ms. Sohebi, woke the Petitioner up for breakfast and remained standing directly in front of the Petitioner's cell door and watched as the Petitioner attempted to descend from her TOP BUNK BED. MS SOHEBI WITNESSED THE PETITIONER FALL FORWARD LANDING ON HER RIGHT HIP, LEG AND HITTING HER RIGHT SIDE OF HER HEAD HARD ON THE OPPOSITE WALL. The hit to her head was so loud that it woke up offenders in cells #1,3 and 6. Ms. Sohebi asked the Petitioner if she was okay. The Petitioner was able to get up with difficulty, confused and dazed, holding her head. Ms. Sohebi notified Lt. Thatket and medical. At 4:45 a.m., Nurse Roanoke came to assess the Petitioner. She took her vital signs and examined the Petitioner's head with her hands. Ms. Roanoke ordered an ice pack for the Petitioner's head for 24 hours and non-aspirin every 6 hours as needed for pain. **(See Exhibit C – Offender Medical Pass)**. Additionally, Ms. Sohebit filed a complete incident report. At around 9:00 a.m., first shift officer, Ms. Backstrawn and safety officer, Mr. Jose Ruiz, Jr., took pictures of the Petitioner's right hip, leg, ankle and right side of her head. Some bruising was beginning to occur on the Petitioner's hip, knee and ankle. Sgt. McGill was also notified of the incident. **DESPITE THIS INCIDENT, NO EFFORTS WERE MADE TO MOVE THE PETITIONER TO A SAFE CELL WITH A BOTTOM BUNK BED, EVEN THOUGH ONE WAS AVAILABLE IN CELL #5.** The Petitioner received a sick call pass to see a nurse for 9:00-9:30 a.m. on Wednesday, May 27, 2015. **(See Exhibit D – sick call pass)**.

### WEDNESDAY, MAY 27, 2015

At around 8:10 a.m., Nurse Reinacher came to examined the Petitioner and at this time, the Petitioner informed the nurse that she was having headaches, dizziness and objects appeared to be lop-sided. The nurse informed the Petitioner that she would need to see a neurologist because of her symptoms and would expedite HER APPOINTMENT TO SEE A DOCTOR. At this time, THE PETITIONER HAD NOT SEEN A PHYSICIAN POST HEAD INJURY. First shift officer, Ms. Aguirre was on duty during this nurse visit.

### THURSDAY, MAY 28, 2015

First shift officer, Ms. Davenport called the nurse about the Petitioner's continued headaches and dizziness. Nurse Northkett told Ms. Davenport to have the Petitioner place her mattress on the floor and that medical would see her soon. At 8:15 a.m., ASSISTANT WARDEN FRANKS AND MAJOR WILLIAMS came to E-Dorm for an unrelated issue. at that time, THE PETITIONER APPROACHED BOTH REGARDING THE HEAD INJURY SHE HAD SUSTAINED AND REQUESTED TO BE MOVED TO A BOTTOM BUNK BED. WARDEN FRANKS FIRMLY STATED THAT UNLESS MEDICAL GAVE HER A BOTTOM BUNK BED RESTRICTION, SHE WAS NOT GOING TO DO ANYTHING TO MOVE THE PETITIONER AT ALL, REGARDLESS OF THE FACT THAT THE PETITIONER HAD FALLEN AND INJURED HER HEAD. WARDEN FRANKS DISMISSED THIS INJURY AS INSIGNIFICANT TO ANY DECISION SHE COULD HAVE MADE. THE PETITIONER RELATED TO WARDEN FRANKS THE SYMPTOMS SHE WAS EXPERIENCING AND ASKED IF SAFETY WAS NOT A CONCERN FOR HER. WARDEN FRANKS STATED, "WHAT DON'T YOU UNDERSTAND ABOUT WHAT I'VE JUST TOLD YOU? I AM NOT MOVING YOU, NO MATTER WHAT!" THE PETITIONER CONTINUED TO STATE TO THE WARDEN THAT THIS WAS AN ISSUE OF HER HEALTH AND SAFETY. WARDEN FRANKS STATED, "I'M NOT TALKING TO YOU ABOUT THIS ANYMORE!" AND WALKED AWAY. SHE SHOWED NO CONCERN THAT A SAFETY HAZARD WAS BEING PLACED UPON THE PETITIONER. Later that day, a meeting on policy change was held by Warden Nelson, Assistant Warden Franks, Major Williams and Ms. Williams of Classification with all Protective Custody offenders as they were pulled out one by one. When the Petitioner was pulled out for her turn and at the conclusion of the meeting, WARDEN NELSON STATED TO HER, "SALDIVAR, I JUST FINISHED TALKING TO YOUR SISTER AND I ASSURED HER, AS I AM ASSURING YOU, THAT I WILL TAKE CARE OF YOU AND MAKE SURE YOU SEE MEDICAL. YOUR FAMILY NEED NOT TO BE BOTHERED ABOUT YOU WITH EVERYTHING YOU ARE GOING THROUGH" alluding to the death of the Petitioner's mother on May 3, 2015. **{See Exhibit E — Funeral Home notice4 of Petitioner's mother's death).** The Petitioner responded, "WARDEN NELSON, I NEED A BOTTOM BUNK BED FOR I FEAR FALLING AGAIN AND NOW I HAVE A HEAD INJURY AND I HAVE NOT SEEN MEDICAL FOR IT". Warden Nelson stated that medical would be seeing the Petitioner. Yet, as medical records and TDCJ-ID records will show that the Petitioner did not see medical post her head injury and it was not until 10 days after that Dr. Burleson saw the Petitioner. At the meetin, Assistant Warden Franks kept shaking her head indicating "NO" to the Petitioner's request to be moved.

### FRIDAY, MAY 29, 2015

First shift officer, Ms. Teague, informed medical of the Petitioner's continued symptoms of headaches and dizziness and how officers were now requiring the Petitioner to have a pass to place her mattress on the floor. Nurse Northkett informed Ms. Teague that no nurse had entered anything into the Petitioner's medical chart about any medical issues and for the Petitioner to drop a form. Third shift officer, Ms. Brockington, being informed of the Petitioner's current condition, told the Petitioner to place her mattress on the floor and that if security required an explanation as to why it was on the floor, they could speak to her for she was not going to be a witness to another incident by the Petitioner. She saw the safety hazard a TOP BUNK BED posed to the Petitioner.

### SATURDAY, MAY 30, 2015

Nurse P. Booth made rounds at 6:10 a.m. and at that time, the Petitioner was asleep. Many times, nurses just walk through the Dorm without making any announcements. When first shift officer, Ms. Sorenson arrived, she inquired why the Petitioner was sleeping on the floor with her mattress. The Petitioner explained to her about officer Brockington's decision the night before. Ms. Sorenson then notifies Lt. Evans when he made rounds at 7:15 a.m. Ms. Sorenson witnessed the Petitioner complaining of a headache and dizziness when she woke up and gave her cold water so she could wet a washcloth to put around her neck. Ms. Sorenson told the Petitioner to lie down BUT WOULD NOT CALL MEDICAL. When pill line came at 2:02 p.m., medical tech brought another person with her who did not identify herself as a nurse, and both passed out pills. Had the other person identified herself as a nurse, the Petitioner would have approached her to relate her symptoms. When second shift officer, Ms. Keen, arrived on duty, the Petitioner asked her to please call medical and relate the Petitioner's current condition. Nurse Kaplan, who did rounds with the med tech earlier, told Ms. Keen that they knew the Petitioner was LYING about her symptoms and that if she felt sick to drop a form and drink water. Ms. Keen then called Lt. Maneer about this situation. Lt. Maneer asked why the Petitioner had not spoken to the nurse during pill line. Because the Petitioner does not take medication during pill line, the med tech nor the nurse approached her cell. The Petitioner does not have the liberty to just walk up to them. When Lt. Maneer made rounds, the Petitioner spoke to her regarding her symptoms, the pill tech, and the accusation of lying. The Petitioner expressed her frustration with Unit Rank not taking her complaints post head injury seriously. At around 9:00 p.m., and after a call by the Petitioner's family, the Petitioner was escorted by officers Hapercamp and Bennett to medical where Nurse Roanoke examined her. The Petitioner's vital signs sitting and standing were tilted by 20 points and the nurse voiced her concern about that. She remarked to the Petitioner that she was dehydrated and she gave her a pass for her to keep her mattress on the floor pending review by a provider. (See Exhibit F - Offender medical pass). She ordered the Petitioner to be given non-aspirin as needed and promised to expedite an appointment to see the provider. Ms. Roanoke stated that the main reason the Petitioner had not seen a provider was because there was no providers available and that medical was behind on appointments. Ms. Roanoke said she would try to squeeze an appointment for the Petitioner into the current doctor's schedule but did not promise it would be possible. She examined the Petitioner's head and found a lump on her right side of her head. Ms. Roanoke said she would inform the nursing director of the Petitioner's current condition for a rapid response. She also stated that the Petitioner had a BOTTOM BUNK BED restriction which had expired on November, 2013. Nurse Roanoke apologized to the Petitioner that Nurse Reinacher had failed to enter anything into the Petitioner's file on Wednesday, May 27, 2015 about the Petitioner needing to see a neurologist and expediting an appointment to see a provider. The Petitioner stated that even though there may not be nursing notes by Ms. Reinacher, the fact remains that she saw the Petitioner on that day because the visitor log verifies that she came to E-Dorm to see the Petitioner. Officer Aquirre was on duty to witness this and let her into the E-Dorm building.

## SUNDAY, MAY 31, 2015

The Petitioner complained of waking up with dizziness and feeling off balanced to E-Dorm's first shift officer, Ms. Sorenson but she refused to call medical.

## MONDAY, JUNE 1, 2015

The Petitioner complained of waking up with headaches and dizziness again of first shift officer, Ms. Sorenson. As nurse McCutchin made rounds, the Petitioner notified her of her current condition. Ms. McCutchin stated they were trying to expedite the Petitioner's appointment to see a doctor.

## TUESDAY, JUNE 2, 2015

The Petitioner woke up with a headache and dizziness. Nurse Reinacher was making rounds and the Petitioner notified her of her current condition. Ms. Reinacher stated that they knew of the Petitioner's condition and would make another effort to expedite her sick call to see a doctor. The Petitioner mentioned her conversation with Nurse Roanoke to Nurse Reinacher and that there was some confusion between them. NURSE REINACHER THEN STATED THAT IF THERE WAS A SECURITY OR SAFETY RISK TO THE PETITIONER'S HEALTH AND WELL-BEING, THE WARDEN COULD TAKE ACTION AND MOVE THE PETITIONER TO A BOTTOM BUNK BED WITHOUT WAITING FOR MEDICAL. SHE STATED THAT MEDICA COULD SUGGEST THE BEST CARE FOR AN OFFENDER BUT THAT IT WAS UP TO SECURITY TO IMPLEMENT THE CHANGE. The Petitioner informed her that Wardens Nelson and Franks would not move her to a BOTTOM BUNK BED wihtout a medical restriction. Instead, they preferred to let the Petitioner remain in a TOP BUNK BED and have her sleep on the floor, EVEN THOUGH CELL #5, A BOTTOM BUNK BED WAS AVAILABLE. Nurse Reinacher again stated that she would do what she could to help the Petitioner.

## WEDNESDAY, JUNE 3, 2015

The Petitioner notified first shift officer, Ms. Moore, that she woke up feeling off balance with a headache. The Petitioner asked Ms. Moore to please notify medical and she refused. That evening, the Petitioner receives a visitation pass for June 4, 2015. **(See Exhibit G - visitation pass)**.

## THURSDAY, JUNE 4, 2015

The Petitioner wakes up complaining of feeling dizzy with an upset stomach and a thrombing headache. She notifies first shift officer, Ms. Teague of her current condition and Ms. Teague notifies medical. The Petitioner showers and prepares to go to her visit. At her visit, Petitioner's upset stomach persisted as well as her headache and after drinking half a sprite soda and half of a banana muffin, the Petitioner vomits. First shift officer, Mr. Horne, witnesses the Petitioner vomiting and escorts her to the bathroom so that the Petitioner can finish vomiting. At this time, the Petitioner is feeling weak, shaky and dizzy with a huge headache. Her visitor's (sister Maria Elida Saldivar and niece Veronica Ann Saldivar) decided to cut the visit short so that the Petitioner could be attended

to. Mr. Horne notified Rank and two escorts (Sgt. Ignal and Ms. Andrews) arrived to escort the Petitioner back to her Dorm. Back at the Dorm, Officer Teaque tells the Petitioner to lie down on the floor with her mattress and provided her with a cold wet towel to place on her face. The Petitioner's sister remained behind to speak with the Warden about the Petitioner's condition. Warden Franks and Major Williams spoke to the Petitioner's sister. Approximately 15 minutes later, two escorts arrived in E-Dorm (Ms. Scott and Mr. Horne) to take the Petitioner to see medical. The Petitioner's vital signs were taken and she was placed in the exam room with Dr. Burleson. **(See Exhibit H – Offender's medical records).** Nurse Booth informed the doctor about the INCIDENT REPORT DONE ON May 26, 2015 REGARDING THE PETITIONER'S FALL AND HEAD INJURY AND THE SUBSEQUENT COMPLAINTS THE PETITIONER HAD REPORTED TO THE NURSES ABOUT THE HEADACHES, DIZZINESS AND FEELING OFF BALANCE. Dr. Burleson examined the Petitioner's right eye first, then the left and felt uncomfortable with his findings. Dr. Burleson then made a call to Huntsville to get authorization for a CT SCAN at Coryell Memorial Hospital. The Petitioner continued to have a headache, and upset stomach. Dr. Burleson stated he would not give the Petitioner anything until after the CT SCAN and that he had ordered she be placed in a BOTTOM BUNK BED restriction immediately. **(See Exhibit I – Health Summary for classification).** The Petitioner was escorted to the back gate where she was placed in a van and taken to the hospital with escorts, Sgt. Keeler, Ms. Scott and Mr. Horne. At the hospital, the Petitioner continued to experience the same symptoms. The emergency room doctor examined the Petitioner and performed a neurological exam. The Petitioner was then taken to have a CT SCAN. Afterwards, the Petitioner was placed in the exam room where an intravenous vein was begun. Intravenous medications were administered. The Petitioner was evaluated regularly to ensure that her head swelling had receded and that her condition had improved. The doctor informed the Petitioner that she had suffered a possible concussion after the fall on May 26, 2015 and possible swelling that were causing her symptoms. The doctor stated that besides this concussion, the CT SCAN was normal. The Petitioner was allowed to recover after the intravenous medications and then discharged back to TDCJ care. **(See Exhibit J – Coryell Memorial Hospital emergency room medical records).** The Petitioner was then transported back to Mountain View Unit, taken to medical to see Nurse Booth and informed of the findings of the emergency room doctor. The Petitioner was then escorted back to E-Dorm WHERE HER HOUSING ASSIGNMENT HAD CHANGED FORM CELL #2 TOP BUNK BED TO CELL #5 BOTTOM BUNK BED WHICH HAD BEEN AVAILABLE FOR OVER A WEEK. The Petitioner felt weak and so she laid down to sleep.

### FRIDAY, JUNE 5, 2015

The Petitioner woke up complaining of a slight headache but experienced no nausea or vomiting, so was able to shower without difficulty.

### SATURDAY, JUNE 6, 2015

The Petitioner woke up complaining of a headache, placed a cold washcloth to her head and after several hours, she was able to shower without difficulty. She notified Mr. Williams who was making nursing rounds.

The Petitioner contends that as a prisoner of the State of Texas, she suffered "CRUEL AND UNUSUAL PUNISHMENT" at the hands of prison officials when they knowingly and deliberately disregarded and ignored a safety hazard that was a precursor to an "INJURY" that could occur and "DID OCCUR". Furthermore, medical attention by TDCJ Contractor UTMB medical personnel in providing prompt medical evaluation to Petitioner's head injury by a physician immediately following her fall was denied for 10 days. There is a specific TDCJ policy that constrains prison officials judgment other than the prison's general duty to house offenders to a particular cell and their decision-making ability. TDCJ safety policy ED.-10.61 by the authority of Tex.Gov't Code §493.006(b), states that TDCJ shall emphasize a safe environment for all employees and "OFFENDERS". TDCJ is committed to "COMPLIANCE" with all applicable "SAFETY RULES" and regulations. Employees shall follow all "SAFETY" policies and procedures and report "UNSAFE CONDITIONS", "HAZARDS", or acts as described in AD.-10.63, "Operational Risk Assessment Program" and the TDCJ "Risk Management Program Manual". The Petitioner asserts, AS SHE HAS DESCRIBED IN THE "FACTS", that she raised SAFETY and HAZARDOUS concerns to different prison officials about the unsafe cell with a TOP BUNK BED thereby triggering the policy. There is no doubt that the Petitioner fell from her ASSIGNED TOP BUNK BED, as indicated by the incident report and medical records, and sustained a HEAD INJURY to the right side of her head, an injury that was preventable had the prison officials ACTED with CAREFULNESS rather than RECKLESSLY, SADISTICALLY and WANTONNESS. A head injury and/or a head concussion, regardless of the severity of the injury, must never be dismissed as insignificant at any stage of a person's life even after it has been examined by a physician. There can be lasting effects (i.e. seizures, headaches, tumors, diseases, etc.). Yet, the Petitioner's fall and HEAD INJURY was treated by

TDCJ prison officials and UTMB medical personnel as a minimal to a non-existence type of importance. The Petitioner complained of headaches, dizziness and feeling off balance to prison officials and UTMB medical personnel (i.e. nurses). These complaints were address by some nurses, NOT ONE TIME BY A PHYSICIAN, other times they were ignored and on one occasion the Petitioner was called a "LIAR". The Petitioner did NOT see a physician IMMEDIATELY after when the head injury occurred. It was on the 10th day (June 4, 2015) AFTER the Petitioner's head injury on May 26, 2015 that she finally saw UTMB Dr. Burleson for her symptoms that included a throbbing headache, dizziness, nausea and vomiting which got prgressively worse. There is no question that the Petitioner was EXPOSED TO A SERIOUS HARM (i.e assigned to a TOP BUNK BED) and after suffering a fall and sustaining a head injury, was denied a cell change and medical care for 10 days. The Petitioner was deprived of a basic human need (free from injury, medical care and at a minimum some running water) meeting the "OBJECTIVE STANDARD" as required by the Eighth Amendment. From the moment the Petitioner was informed that she was moving from an assigned BOTTOM BUNK BED (cell #1) to an assigned TOP BUNK BED (cell #2) by Lt. Holcutt, Sgt. Briggs and Ms. Coble, she IMMEDIATELY INFORMED them that it was difficult for her to climb up or down of a TOP BUNK BED and that this created a SAFETY HAZARD that could and DID result in the Petitioner sustaining a physical injury. THEY REFUSED TO LISTEN. Instead, prison officials IGNORED HER PLEAS AND THE PROBLEM. UTMB medical personnel acknowledged that the Petitioner's "LEGS ARE NOT LONG ENOUGH TO STRETCH THE DISTANCE FOR THE RUNGS LEADING TO TOP BUNK". (See Exhibit F). The Petitioner also INFORMED other prison officials such as Warden Nelson, Assistant Warden Franks, Major Williams, Sgt. McGill, Lt. Evans and other officers of this SAFETY HAZARD. Prison officials were FULLY AWARE that the Petitioner was assigned and placed in an UNSAFE CELL and her HEALTH and SAFETY

were at risk. Prison officials cannot claim that they knew nothing about the Petitioner falling on May 26, 2015 from her TOP BUNK BED and hitting her head for such an injury required the filing of an "INCIDENT REPORT" which was filled out by Officer Sahebi requiring the "NOTIFICATION" of a Ranking prison official (i.e. Capt., Major or Warden). The incident report, the photos taken post head injury and the notification and triage examination of medical NURSES are stubborn facts that indeed show prison officials were notified, knew of the Petitioner's condition and did not respond to it in a reasonable manner. Yet, **ALL** of them refused to listen to the Petitioner's pleas and complaints. (The Petitioner is not privy to the incident report and/or records). When the Petitioner spoke to Assistant Warden Franks on May 28, 2015 (See "FACTS" on May 28, 2015), 2 days after the Petitioner's head injury, she knew of the Petitioner's injury by acknowledging that even with the head injury , she was not moving the Petitioner to a safe cell, EVEN THOUGH A CELL WAS AVAILABLE (BOTTOM BUNK BED CELL #5). She preferred the Petitioner sleep on the floor with her mattress contrary to policy. (The Petitioner is not privy to the Post Orders posted for officers only regarding this policy as officers informed the Petitioner). Assistant Warden Franks, as a decision-maker for TDCJ and enforcer of all policies, her wanton, sadistic and obdurate behavior is clearly illustrated by her blatant inaction. She failed to take remedial action knowing the facts as they were. Assitant Warden Franks's behavior is prohibited by the cruel and unusual punishment clause of the Eighth Amendment as a TOP BUNK BED jeopardized Petitioner's safety. The Petitioner's fall was witnessed by a prison official and upper Rank (as a whole) knew of this incident and purposefully ignored it. Prison officials had the culpable state of mind necessary for the punishment to be regarded as "CRUEL AND UNUSUAL", regardless of the actual suffering inflicted. **WILSON V. SEITER**, 501 US 294,

298, 115 L.Ed.2d 271, 111 S.Ct. 2321. Prison officials are privy to inspect any cell and there is no doubt that they could have seen the potential risk a TOP BUNK BED posed to the Petitioner as cells are visibly seen in their entirety from the hallway as the entire front of the cells are not made of solid material but of mesh. There is no reason for them to claim they had no view of the cell and therefore could not have made an inference as to whether a TOP BUNK BED was hazardous to the Petitioner or not. It was not necessary for the Petitioner to have suffered this wanton infliction of pain by this FORESEEABLE fall and head injury.

Deliberate indifference is the appropriate argument here as the Petitioner sustained a "PERSONAL INJURY OF A PHYSICAL NATURE". **WILSON**, supra. Prison officials including Assistant Warden Franks acted with "DELIBERATE INDIFFERENCE". Their deliberate indifference constituted wantonness and their inaction was malicious and sadistic for the very purpose of causing harm to the Petitioner. In this instant case, where actual deliberation on the part of the defendants is practical, the defendants engaged in conscience-shocking activity by exercising "DELIBERATE INDIFFERENCE". In addition to Petitioner's mistreatment by prison officials, the Petitioner had a SERIOUS medical need (i.e. to be seen by a physician post head injury) and that need was denied for 10 days by UTMB and prison officials violating this clause of the Eighth Amendment. Prison officials and TDCJ's Contractor UTMB exhibited "DELIBERATE INDIFFERENCE" when the Petitioner was NOT moved to a safe, BOTTOM BUNK BED cell before or immediately after her head injury as neither entity would make a decision that would ensure the Petitioner's safety. This did not occur until June 4, 2015 (10 days post head injury) when Petitioner was evaluated by UTMB physician Dr. Burleson who ORDERED that the Petitioner be moved to a BOTTOM BUNK BED immediately and indefinitely. Therefore, Warden Nelson, Assistant Warden

Franks and those prison officials they supervise including TDCJ Contractor UTMB medical personnel are without excuse for the manner the Petitioner was mistreated and ignored through this whole process. They knew of the Petitioner's condition and did not respond to it in a reasonable manner. This type of abuse by prison officials and UTMB was not a necessary part of prison discipline.

The Petitioner filed a Step I grievance on May 20, 2015, the day the Petitioner was moved from a BOTTOM BUNK BED to a TOP BUNK BED, detailing the issue of the safety hazard that the Petitioner was forced to endure. **(See Exhibit K** – Step I grievance and their response). Warden Nelson in her response to the grievance **DISMISSED** the entire issue and instead quoted a policy. When Warden Nelson came to manage Mountain View Unit, she placed this policy she quotes in the grievance for Protective Custody offenders to have cell rotations every 90 days, "NOT 60 DAYS" as she misleads in her response to the grievance. TDCJ records will show that the last two rotations before the date in question, the Petitioner was moved in November, 2014 from cell #5 to cell #3. 90 days later on February 23, 2015, the Petitioner was moved from cell #3 to cell #1 (both BOTTOM BUNK CELLS). On May 20, 2015, THE DATE IN QUESTION, the Petitioner was moved from cell #1 to cell #2 BECAUSE OF PLUMBING PROBLEMS that another offender was having and NOT because of the cell rotation as Warden Nelson asserts in her response to the grievance. Shortly thereafter, to comply with the 90 day rotation, on May 25, 2015, the rest of the Protective Custody offenders were moved. Warden Nelson is being deceitful in her response to the grievance and doesn't address any issue detailed in the grievance. The next part of her answer to the grievance, she states that the Petitioner did not have a BOTTOM BUNK BED restriction. According to Mr. Graham from the grievance department and by the instructions of Ms. Williams of TDCJ-ID

Classification (See "FACTS" on May 20, 2015), Ms. Williams stated to Mr. Graham that notes on Petitioner's travel card indicated that if an offender was below a certain height, she was assigned a BOTTOM BUNK BED. Therefore, the Petitioner was NEVER assigned a TOP BUNK BED. The reason was obvious. Her height prohibited it.

When the Petitioner was moved to a TOP BUNK BED, she complained immediately and made repeated pleas to prison officials of the safety hazard that a TOP BUNK BED posed to her. They refused to listen to her and turned their faces the other way. It is reasonably, then, to believe that had the Petitioner not complained and alerted prison officials that this TOP BUNK BED was hazardous to her, they would have blamed the head injury on the Petitioner for not notifying them. It is egregious that prison officials would not consider moving the Petitioner after so many complaints of this safety hazard (even "MORE" so after her head injury) without specific order by medical. This goes against prison policy that the Petitioner triggered with her complaints and against her constitutional right to be free from harm or injury. Prison officials cannot claim they enforce policy and on the other hand refuse to perform that same policy (KNOWING A SAFETY HAZARD EXIST) unless others intervene. They why do policies exist if not to be enforced? Prison officials willingly disregarded the safety hazard and health risk that lead to the Petitioner's head injury and disregarded the need for medical attention to be seen by a physician, "ALL IN VIOLATION OF PETITIONER'S RIGHT AGAINST 'CRUEL AND UNUSUAL PUNISHMENT' GUARANTEED BY THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION".

Besides placing the Petitioner's safety at risk in a unsafe TOP BUNK BED, her head injury was not promptly evaluated by a medical physician until 10 days after the head injury. The Petitioner continued to have a throbbing headache,

dizziness, nausea and feeling off balance even after 10 days post-head injury. Prison officials grossly neglected to ensure that the Petitioner receive adequate medical care. The Petitioner filed a Step I and Step II grievance against UTMB **(See Exhibit L** - Step I and Step II grievances and their responses). UTMB medical personnel in their response to the grievance ADMIT that it was on June 4, 2015 (10 days AFTER THE PETITIONER'S HEAD INJURY ON MAY 26, 2015) that the Petitioner was FIRST SEEN by a physician, Dr. Burleson. They also ADMIT that they did not have a provider available for the Petitioner to be seen. THIS IS NOT THE PETITIONER'S FAULT THAT THE PRISON FACILITY HAD NO AVAILABLE PROVIDER(S). This is the responsibility of UTMB and prison officials to have providers for TDCJ offenders. Prison officials and UTMB

personnel seem to want to infer that because there were no providers available, HEAD INJURIES or the like are considered insignificant at the time they occur unless death is imminent. Therefore, it is reasonable to conclude that the Petitioner's head injury was taken lightly and considered as a non-serious type of injury. Nurse Roake's assessment date May 30, 2015 (See Exhibit F), states that the Petitioner has a "SMALL HEMATOMA THAT WAS PALPABLE". This "HEMATOMA" was still present after 4 days post head injury. Hematomas decrease in size and shape as days go by. To claim by UTMB medical personnel that the Petitioner was seen and not being neglected by medical nurses who cannot diagnose, as legitimate and proper, is preposterous. TDCJ and UTMB in concert could have had the Petitioner evaluated at the emergency room at Coryell Memorial Hospital for her head injury. THEY DID NOT. The Petitioner felt, as any sane person would, that any injury to the head/scalp/brain should be examined BY A PHYSICIAN for any possible head trauma. No lay person or NURSE can decipher the extent of an injury to the head without proper medical evaluation. Furthermore, UTMB medical personnel were untruthful in their

response to the grievance when they stated, "YOU WERE SEEN BY DR. BURLESON ON 6/4/15 FOR YOUR "COMPLAINT" OF NAUSEA AND VOMITING AFTER FALLING FROM YOUR TOP BUNK ON 5/26/15". The Petitioner was not seen for her "COMPLAINT" of nausea and vomiting. The Petitioner had ACTUALLY vomited after having a throbbing headache and feeling nauseated since waking up on the morning of June 4, 2015 (10 days AFTER HER HEAD INJURY) and vomiting at her visit in front of her visitors (sister and niece) and TDCJ officer, Mr. Horne. (See Exhibit H – doctor's notes). To say it was a "COMPLAINT" is misleading and inaccurate. Regardless of UTMB medical personnel claiming in the grievance that the "THE HOSPITAL'S NOTES STATE THAT THE CAUSE OF YOUR HEADACHE ON THAT DAY (JUNE 4, 2015) IS NOT CLEAR BUT DOES NOT APPEAR TO BE A SERIOUS ILLNESS", they CANNOT guarantee or assure the Petitioner that as a result of the fall she sustained on May 26, 2015, she will never suffer recurrent symptoms from this head injury in the future. According to Coryell Memorial Hospital Emergency Room Records on June 4, 2015, state that the Petitioner had "HYPERTENSION, TACKYCARDIA AND LOW OXYGEN SATURATION". The clinical impression concluded that the Petitioner had a headache and a "CONCUSSION". (See Exhibit J - Coryell Memorial Hospital Records). A CONCUSSION is an injury to a soft structure, especially the brain, produced by a violent blow and followed by a temporary or prolonged loss of function. A CONCUSSION, if not evaluated by a medical physician immediately after it occurs, cannot be properly determined of its effects after many days post injury. The throbbing headache, nausea and vomiting the Petitioner was experiencing on June 4, 2015, and for which she was taken to Coryell Memorial Hospital to undergo a CT SCAN, were not of a sudden attack of symptoms but a gradual onset of symptoms she suffered from the impact of her fall.

OBJECTIVELY the facts are:

(1) that the Petitioner was assigned to an UNSAFE CELL with a TOP

BUNK BED;

(2) that the Petitioner made repeated complaints to prison officials which were ignored;

(3) that on May 26, 2015, the Petitioner suffered a fall and injured her head, hip and ankle;

(4) that the Petitioner suffered post-injury throbbing headaches, dizziness and feeling of being off-balanced;

(5) that the injury was serious enough to file an incident/injury report;

(6) that the Petitioner was seen by UTMB nurses, BUT NOT evaluated by a physician until after 10 days post-head injury;

(7) that the Petitioner's symptoms continued for 10 days;

(8) that the Petitioner was finally seen by UTMB Dr. Burleson on June 4, 2015, 10 days after her head injury;

(9) that the Petitioner had a CT SCAN done at Coryell Memorial Hospital; and

(10) that the Petitioner received intravenous medications.

The Petitioner's head injury and symptoms were SUFFICIENTLY SERIOUS that steps (i.e. CT Scan) were taken to ensure whether or not the Petitioner had suffered a brain trauma and/or injury. AND SHE DID. The Petitioner suffered a CONCUSSION as indicated by the Emergency Room Physican and given intravenous medication to alleviate the symptoms. But this treatment came at the expense of the Petitioner's suffering for 10 days before any action was taken by prison officials and/or UTMB medical personnel. It is reasonably to conclude that the Petitioner was blatantly denied constitutional rights by prison officials and UTMB medical personnel and suffered physical and mental anguish as a consequence. The Petitioner filed a Step I and Step II grievance. **(See Exhibit M** - Step I and II grievance and responses). Warden Nelson continues to insist that

because the Petitioner did not have a LOWER BUNK restriction, a TOP BUNK was appropriately assigned until the Petitioner was given a BOTTOM BUNK restriction. What Warden Nelson fails to STATE and ADMIT is that the Petitioner made repeated complaints and pleas to prison officials of a safety hazard which she and those she supervises FAILED to address.

The Petitioner has shown under the SUBJECTIVE part of the test to have met this Eighth Amendment standard by showing that from Warden Nelson to all those prison officials she supervises, everyone was FULLY AWARE the Petitioner was being deprived of a basic human need (i.e. freedom from injury, medical care) and when Petitioner's pleas and complaints to them about her unsafe cell and head injury, they ignored them. This basic need was a minimal, civilized measure of life's necessities. Something prison officials could have provided BUT DID NOT. The Petitioner has also proven that she suffered a physical head injury that could result in a more serious condition in the future. Prison officials did not respond in a reasonable manner before or even after the head injury, by refusing to move the Petitioner to a safe cell, thereby meeting the requirement of this standard. Through their recklessness and wanton negligence, the Petitioner suffered a head injury with its accompanying and prolonged physical suffering and mental anguish.

The Fourteenth Amendment creates numerous rights enforceable namely substantive and procedural due process, the equal protection of the laws, and those rights from the Bill of Rights incorporated by the Due Process Clause of the Fourteenth Amendment. These incorporated rights include the Eighth Amendment protection against cruel and unusual punishment. When a Petitioner asserts a violation of an incorporated right or a right protected under the substantive component of the Due Process Clause, the violation is complete at the time of the challenged conduct.

"The substantive component of due process protects against 'certain government actions regardless of the fairness of the procedures used to implement them'". SOUZA V. PINA, 53 F.3d 423, 425-26. "[T]he criteria used for identifying government action proscribed by the constitutional guarantee of substantive due process vary depending on whether the challenge action is legislative or executive in nature". DePOUTOT, 424 F.3d at 118. Where, as here, it is an executive action that is challenged, the threshold question is "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience". COUNTY OF SACRAMENTO V. LEWIS, 523 U.S. 833, 847 n.8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). Prison officials from Warden Nelson to those under her command, played a role in causing the harm and head injury that the Petitioner sustained and their behavior towards the Petitioner can only be said that it was egregious, outrageous and did shock the contemporary conscience that they would practice their duties in such a manner. It is well established that "negligence" without more, is simply insufficient to meet the conscience-shocking standard". J.R. V. GLORIA, 593 F.3d 73, 80 (1st Cir. 2010). A hallmark of successful challenges is an extreme lack of proportionality, as the test is primarily concerned with "violations of personal rights...so severe...so disproportionate to the need presented, and ...so inspired by malice and sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking the conscience". MORAN V. CLARKE, 296 F.3d 638, 647 (8th Cir. 2002). The Petitioner has proven that her personal rights were severely violated in such a malice and sadistic way that was brutal and inhumane abuse of prison officials power thereby shocking the conscience.

Prison officials provides uncompensated supervised jobs to qualified

offenders with safety training in equipment and chemical use. Offenders are required to sign a TDCJ training document stating they understand the proper use of those items. This is done for safety reasons. Similarly, being assigned to a TOP BUNK BED should require the proper training to step up and down on the rungs as a safety precaution. There is no training or safety guidelines on the proper use of rungs needed for a TOP BUNK BED. The offender has no choice when place in an assigned TOP BUNK BED on how to climb up and down using the rungs, to do the best to learn how to use those rungs. Otherwise, disciplinary action is possible for refusing a housing assignment.

According to nurse Williams, the Petitioner had a BOTTOM BUNK BED restriction that expired in November, 2013. Medical records do not show if this restriction was discontinued by automatic cancellation or by the orders of a medical doctor. NOTIFICATION to offenders to remove or cancel any restrictions is NOT REQUIRED nor part of a nurse's duty as nurses have confirmed this to offenders.

It is evident that the Petitioner would not be moved by prison officials (i.e. Warden Nelson, Asst. Warden Franks or Major Williams) unless she got a medical restriction for a BOTTOM BUNK BED. Medical personnel (i.e. doctor) could not see the Petitioner because they had no providers available. Literally, the Petitioner was obstructed from moving forward in order to resolve this issue. Instead, the Petitioner was forced to endure an unsafe assigned cell, risk a physical injury (which did occur) and had no medical attention post head injury. Even after the Petitioner suffered a head injury on May 26, 2015, the prison officials refused to move her. This behavior is the same as obduracy and wantonness. There is much discussion in our society, especially in the National Football League, regarding head injuries and/or concussion. This is because of the effects post head injury having lasting problems. A concussion

sustained in prison is no different from getting hit by a teammate in a football field.

The Petitioner directs this Court's attention that the prison grievance process is an "INTERNAL" investigation conducted by those individuals connected to those who are the subject of this action. It is partial, unfair and unbalanced. By the grievance responses, deceitfulness is accepted, there is no oversight, and those conducting the investigation are part of the establishment who submit the finding of facts to those involved in the violation of the Petitioner's constitutional rights.

State prisoner who brought §1983 Eighth Amendment deliberate indifference action against corrections officer...did not fail to exhaust his administrative remedies, under the PLRA with respect to his claim for money damages in his prison grievances; prisoner did not procedurally default the money damages claim, since state policy for written prison grievances stated that prisoner "MAY include a request for compensation or other legal relief in the grievance, but it did not require it". SPRUILL V. GILLIS, CA3 (PA) 2004, 372 F.3d 218 Civil Rights 1319. In this instant case, the Petitioner DID NOT procedurally default the money damages claim for failing to request for money damages in her prison grievances because TDCJ written prison policy A.D.-03.82 Management of offender grievances states:

> VIII.G.  Remedies
> The following are possible remedies:
> 1. Restitution of property, either monetary or compensation;
> 2. Change of policy, procedure, rule or practice;
> 3. Corrections of records; or
> 4. Other relief, as appropriate.
> **Requests for disciplinary action against employees or COMPENSATION FOR PUNITIVE DAMAGES SHALL NOT BE ADDRESSED THROUGH THE OFFENDER GRIEVANCE PROCEDURES.**

In this case, it is also not required nor allowed per TDCJ prison policy.

## VI. EXHAUSTION OF LEGAL REMEDIES

The Petitioner used the prisoner grievance procedure available at the TEXAS STATE PRISON to try and solve the problem. On 5/20/15, Petitioner presented the facts to prison officials relating to this complaint. On 6/11/15, Petitioner was sent a response saying that the grievance had been denied. On 6/11/15, she appealed the denial of the grievance to the TDCJ Director. She received a response on 8/19/15. Petitioner's grievance and appeal are attached as **Exhibit K.**

The Petitioner used the prisoner grievance procedure available at the TEXAS STATE PRISON to try and solve the problem. On 5/28/15, Petitioner presented the facts to TDCJ Contractor UTMB relating to this complaint. On 6/30/15, Petitioner was sent a response saying that the grievance had been denied. On 7/8/15, she appealed the denial of the grievance to the medical grievance program, TDCJ Health Services Division. She received a response on 7/20/15. Petitioner's grievance and appeal are attached as **Exhibit L.**

## VII. LEGAL CLAIMS

The Petitioner reallege and incorporate by reference I-VII.

Defendants, Director Guerrero, Warden Nelson, Asst. Warden Franks, Major Williams and officers used reckless negligence by violating a prison rule, TDCJ Safety Policy ED.-10.61. Defendants violated Petitioner's rights under the Eighth Amendment to the United States Constitution and caused Petitioner pain, suffering, physical injury and emotional distress.

Defendants, Director Guerrero, Warden Nelson, Asst. Warden Franks, Major Williams and officers used poor judgment, wantonness, obduracy and sadically acts against Petitioner when Petitioner was not violating any prison rule, nor acting disruptively in any way. Defendants actions violated Petitioner's rights under the Eighth Amendment to the United States Constitution and caused

Petitioner pain, suffering, physical injury and emotional distress.

By witnessing Defendants, Director Guerrero, Warden Nelson, Asst. Warden Franks, Major Williams and officers inaction, failing to correct an inappropriate assigned cell change, encouraging the continuation of keeping the Petitioner in an unsafe cell for 10 days, violating Petitioner's rights under the Eighth Amendment to the United States Constitution and causing Petitioner pain, suffering, physical injury and emotional distress.

Petitioner has no plain, adequate or complete remedy at law to redress the wrongs described herein. Petitioner has been irreparably injured by the conduct of the Defendants and seeks relief from this Court to grant the compensatory damages of $250,000.00 and punitive damages of $250,000.00 the Petitioner seeks.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Petitioner respectfully prays that this Court enter judgment

granting Petitioner:

1.   Compensatory damages in the amount of $250,000.00 against the

defendants jointly.

2.   Punitive damages in the amount of $250,000.00 against the defendants.

3.   Petitioner's costs in this suit.

4.   Any additional relief this Court deems just, proper, and equitable.

DATED: _April 20, 2016_____

Respectfully submitted,

*Yolanda Saldivar*

Yolanda Saldivar, TDCJ #733126
Mountain View Unit
2305 Ransom Rd.
Gatesville, Texas 76528

## VERIFICATION

I have read the foregoing complaint and hereby verify that the matters

alleged therein are true, except as to matters alleged on information and

belief, and, as to those, I believe them to be true.  I certify under penalty

of perjury that the foregoing is true and correct.

Executed at Gatesville, Texas on

Dated: _4-20-16_____

*Yolanda Saldivar*

Petitioner, Yolanda Saldivar

<u>**CERTIFICATE OF SERVICE**</u>

I, Yolanda Saldivar, do hereby certify that the foregoing documents have been mailed via certified and registered mail to the United States District Court, Western District of Texas, Waco Division, 800 Franklin Ave., Room 380, Waco, Texas 76701 on _20_ day of _April_, 2016.

_Yolanda Saldivar_
Petitioner, Yolanda Saldivar

I, Yolanda Saldivar, do hereby certify that the foregoing documents have been mailed via truck mail through the TDCJ mailroom to Mr. William Stephens, TDCJ Director on _20_ day of _April_, 2016.

_Yolanda Saldivar_
Petitioner, Yolanda Saldivar

I, Yolanda Saldivar, do hereby certify that the foregoing documents have been mailed via truck mail through the TDCJ mailroom to Warden Nelson on _20_ day of _April_, 2016.

_Yolanda Saldivar_
Petitioner, Yolanda Saldivar

I, Yolanda Saldivar, do hereby certify that the foregoing documents have been mailed via truck mail through the TDCJ mailroom to Asst. Warden Franks on _20_ day of _April_, 2016.

_Yolanda Saldivar_
Petitioner, Yolanda Saldivar

I, Yolanda Saldivar, do hereby certify that the foregoing documents have been mailed via truck mail through the TDCJ mailroom to UTMB Contractor on _20_ day of _April_ , 2016.

Petitioner, Yolanda Saldivar

E   X   H   I   B   I   T

**"A"**

# EMR Medication Print Pass
## Active Medications From 05/26/2015 to 05/27/2015
### MT. VIEW (MV)

**ALLERGIES:**
NO KNOWN ALLERGIES

---

**PATIENT: SALDIVAR, YOLANDA     MRN: 733126     DOB: 09/19/1960     HOUSING: AP CELL 02**

---

**hydroCHLOROthiazide 25MG TAB**
KOP 1 TABS ORAL DAILY FOR 30 DAYS.
RX DATE: 03/13/2015 08:58 AM          RUN START DATE: 05/03/2015 08:56 AM
ORDERING FACILITY: MT. VIEW (MV)
ORDERING PROVIDER: HAYES, ALEXIS E NP
MEDICATION STATUS: ACTIVE

Rx ID: 18896372
REFILLS: 1 / 11
RUN END DATE: 06/02/2015 08:56 AM
EXPIRATION DATE: 03/28/2016 08:56 AM

ENTRY USER: HAYES, ALEXIS E NP

---

**LEVOTHYROXINE 0.025MG TABLET**
KOP 1 TABS ORAL DAILY FOR 30 DAYS.
RX DATE: 03/13/2015 08:58 AM          RUN START DATE: 05/16/2015 08:56 AM
ORDERING FACILITY: MT. VIEW (MV)
ORDERING PROVIDER: HAYES, ALEXIS E NP
MEDICATION STATUS: ACTIVE

Rx ID: 18896376
REFILLS: 2 / 11
RUN END DATE: 06/15/2015 08:56 AM
EXPIRATION DATE: 03/11/2016 08:56 AM

ENTRY USER: HAYES, ALEXIS E NP

---

**LEVOTHYROXINE 0.05MG TABLET**
KOP 1 TABS ORAL DAILY FOR 30 DAYS.
RX DATE: 03/13/2015 08:58 AM          RUN START DATE: 05/16/2015 08:57 AM
ORDERING FACILITY: MT. VIEW (MV)
ORDERING PROVIDER: HAYES, ALEXIS E NP
MEDICATION STATUS: ACTIVE

Rx ID: 18896378
REFILLS: 2 / 11
RUN END DATE: 06/15/2015 08:57 AM
EXPIRATION DATE: 03/11/2016 08:57 AM

ENTRY USER: HAYES, ALEXIS E NP

---

**METOPROLOL 50MG TABLET**
KOP 1 TABS ORAL TWICE DAILY FOR 30 DAYS.
RX DATE: 10/17/2014 10:26 AM          RUN START DATE: 05/05/2015 10:25 AM
ORDERING FACILITY: MT. VIEW (MV)
ORDERING PROVIDER: HAYES, ALEXIS E NP
MEDICATION STATUS: ACTIVE

Rx ID: 18175118
REFILLS: 6 / 11
RUN END DATE: 06/04/2015 10:25 AM
EXPIRATION DATE: 11/01/2015 10:25 AM

ENTRY USER: HAYES, ALEXIS E NP

---

**NP-ACETAMINOPHEN 325MG TABLET**
KOP 2 TABS ORAL 3 TIMES DAILY FOR 3 DAYS. NURSING PROTOCOL. DO NOT SEND.
RX DATE: 05/26/2015 04:21 AM          RUN START DATE: 05/26/2015 04:21 AM
ORDERING FACILITY: MT. VIEW (MV)
ORDERING PROVIDER: ROARK, DEBRA L R.N.
MEDICATION STATUS: ACTIVE

Rx ID: 19263607
REFILLS: 0 / 0
RUN END DATE: 05/29/2015 04:21 AM
EXPIRATION DATE: 05/29/2015 04:21 AM

ENTRY USER: ROARK, DEBRA L R.N.

---

**OMEPRAZOLE 20MG CAPSULE**
KOP 1 CAPS ORAL DAILY FOR 30 DAYS.
RX DATE: 03/13/2015 08:58 AM          RUN START DATE: 05/16/2015 08:57 AM
ORDERING FACILITY: MT. VIEW (MV)
ORDERING PROVIDER: HAYES, ALEXIS E NP
MEDICATION STATUS: ACTIVE

Rx ID: 18896384
REFILLS: 1 / 11
RUN END DATE: 06/15/2015 08:57 AM
EXPIRATION DATE: 04/10/2016 08:57 AM

ENTRY USER: HAYES, ALEXIS E NP

---

TOTAL FOR SALDIVAR, YOLANDA                                                  6

# E  X  H  I  B  I  T

### "B"

No: 45

Work Assignment:

SUBJECT: State briefly the problem on which you desire assistance.

Medical:

I was on Bottom Bunk Restriction and it expired in Nov. 2013. I need this Restriction to Be Renewed and Placed Indefinitely. I submit this Request to you. Thank You.

Name: YOLANDA-SANDIVAR 733/26

Living Quarters: E-DORM #2 Unit MV

Work Assignment:

DISPOSITION: (Inmate will not write in this space)

P. Booth, RN

SICK CALL

MAY 26 '15 AM 7:23

H-60 (Rev. 11-90)

E X H I B I T

"C"

DEBRA L. ROARK, R.N.

'

PATIENT:            SALDIVAR,YOLANDA
                    1916N.  HWY 36 BYPASS
                    GATESVILLE, TX  76596
MRN:                733126
User:               ROARK, DEBRA L. R.N.


NP-ACETAMINOPHEN 325MG TABLET
Sig:                2 x TABS ORAL 3 TIMES DAILY
                    KOP
Order Date:         05/26/2015 04:21
Start Date:         05/26/2015 04:21
Auto Stop Date:     05/29/2015 04:21
Special
Instructions:       NURSING PROTOCOL. DO NOT SEND.


Duration:           3 Days
Refills:            None


Rx Written On:      05/26/2015


                        Prescription Electronically Signed
                        by DEBRA L. ROARK, R.N.



**OFFENDER MEDICAL PASS**

**Name:** SALDIVAR, YOLANDA      **TDCJ#:** 733126    **Facility:** MT. VIEW (MV) **Date:** 05/26/2015 04:21
**Age:** 54 year **Race:** H **Sex:** female

# ICE PACK X 24 HOURS,
# SECURITY MAY REFILL EVERY 6 HOURS AS NEEDED,
# EXPIRES 4.27.2015 AT 0430

Electronically Signed by ROARK, DEBRA L. R.N. on 05/26/2015.
##And No Others##

**Patient Name:** SALDIVAR, YOLANDA   **TDCJ#:** 733126   **Date:** 05/26/2015 04:44   **Facility:** MT. VIEW (MV)
**Age:** 54 year **Race:** H **Sex:** female
**Most recent vitals from 5/26/2015:** BP: 120 / 80 (Sitting) ; Wt: 171 Lbs.; Height: 58.5 In.; Pulse: 64 (Sitting) ; Resp: 14 / min; Temp: 98 (Oral) BMI: 35
**Allergies:** NO KNOWN ALLERGIES

| Patient Language:   ENGLISH   Name of interpreter, if required: |
| --- |

# **STOP**

**If any of the following are witnessed or reported, initiate the Urgent/Emergent Care Record (HSM-16) and if indicated the appropriate Standing Delegated Orders.**

❖ **If patient is complaining of chest pain, implement the Chest Pain Standing Delegated Orders.**

❖ **After completion of the nursing assessment in the Urgent/Emergent Care Record and vital signs notify provider immediately.**

I. **Generic Signs and Symptoms**
   a. Airway is compromised or threatened
   b. If SpO2 is less than 90%
   c. Peak Flow is less than 80% of personal best (NL adult peak flow without existing disease is 300-500)
   d. If V/S are outside the following parameters (BP less than 90/60 or greater than 180/110, pulse less than 50/min or greater than 110/min, oral temp greater than 101F, respirations greater than 22/min) notify the provider.
   e. B/P readings vary 30 points due to positional changes.
   f. Head trauma within the past 24-36 hours
   g. Difficulty walking
   h. Vomiting/diarrhea
   i. Any loss of consciousness
   j. Stiff neck
   k. Confusion, localized pain in eyes or ears, or slurred speech
   l. Patient sustains an injury, which requires additional analysis (i.e. sutures, x-ray)

II. **Head Injury or Altered Mental Status**
   a. One seizure right after another
   b. First known seizure
   c. Generalized seizure lasting more than 2 minutes
   d. Known or suspected Cerebrovascular Accident (CVA)
   e. Decreased or altered level of consciousness
   f. Head injury

III. **Shock**
   a. Hypotension, i.e. a systolic BP which is less than 90mm Hg with one or more of the following:
      i. Shortness of breath
      ii. Hyperventilation

**Patient Name:** SALDIVAR, YOLANDA   **TDCJ#:** 733126   **Date:** 05/30/2015 21:28   **Facility:** MT. VIEW (MV)
  (PUD), long term steroid use or NSAID use, etc.)
  viii.   Known or suspected sepsis or chronic infectious process

**IV.    Trauma**
  a.   Hypotension, i.e. a systolic BP which is less than 90mm Hg
  b.   Any critical bodily injury or wound
  c.   Uncontrolled bleeding
  d.   Head injury to include a loss of consciousness

**V.    Chest Pain**
  a.   Sudden onset of chest pain without injury
  b.   Chest discomfort associated with tightness or heaviness, pressure, and fullness (like an elephant sitting on your chest)
  c.   Crushing or extremely severe pain which may radiate to back, or neck, or jaw, or shoulders and arms-particularly in left arm
  d.   Chest pain lasting more than a few minutes
  e.   Chest pain may go away and return
  f.   Shortness of breath, sweating, dizziness, nausea, weakness

## If none of the above signs/symptoms are witnessed or reported, proceed with completion of the Contusions & Bites Other Than Snakes Nursing Protocol:

❖ **Contact the provider immediately if any of the following signs or symptoms are present:**
  o **The wound is over a joint with limited range of motion**
  o **Tetanus Toxoid vaccine is indicated (last vaccine over 5yrs is dirty wound or 10yrs if clean)**
  o **The abrasions cover a large area or wound deep enough to weep**

*NURSING ALERT:*
*Observe all skin eruptions carefully for signs of infection such as heat, redness, drainage or honey-colored circular lesions, which could indicate a staph infection and require provider evaluation.*

Mode of arrival:  Place an "X" below

|   | wheelchair | x | ambulatory |   | stretcher |
|---|---|---|---|---|---|

**Current Medications:**
HYDRODIURIL 25MG,   1 TABS ORAL QD
LOPRESSOR 50MG,   1 TABS ORAL BID
PRILOSEC 20MG,   1 CAPS ORAL DAILY
SYNTHROID 0.025MG,   1 TABS ORAL QD
SYNTHROID 0.05MG,   1 TABS ORAL QD

| Current Medications: | Dose | Freq. | Last Dose |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Correctional Managed Care**
**NURSING PROTOCOL FOR**
**MUSCULOSKELETAL SYMPTOMS**

**Patient Name:** SALDIVAR, YOLANDA   **TDCJ#:** 733126   **Date:** 05/26/2015 04:44   **Facility:** MT. VIEW (MV)
SYNTHROID 0.05MG,  1 TABS ORAL QD

| Current Medications: | Dose | Freq. | Last Dose |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

| **SCR INITIATED?** |  | YES | Date Received: |
|---|---|---|---|
|  | X | NO | SEEN IN CELL IN E DORM |

NP – MUSCULOSKELETAL SYMPTOMS
**SUBJECTIVE DATA:**
   Chief Complaint(s): security called at 0405.  Offender was getting down from the top bunk when she slipped off the rung and fell hitting her head against the wall.  The impact was hard per security.  Offender immediately complained of a right sided headache in the back of her head and right hip pain._____

Significant Medical History (Describe): __HTN, GERDS, HYPOTHYROIDISM__

Quantitative Pain Scale:  Place an "X" below

| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 |
|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  |  |

**Qualitative Description of Pain**

| Location:back right side of head | Onset:0405 |
|---|---|
| Duration:30 minutes | |
| Aggravating Factors: pain | |
| Alleviating Factors:has already taken non-aspirins for pain | |

| Pain Character: |  | Dull |  | Sharp | x | Throbbing | Other: |
|---|---|---|---|---|---|---|---|
| Frequency: | x | Constant |  | Intermittent |  | Other: | |
| Radiating: | x | No |  | Yes |  | Location: | |

History of: she fell off the top bunk and hit her head on the wall

| x | Recent  Trauma |  | Surgery |  | Strenuous Activity |
|---|---|---|---|---|---|

History of Similar Problem?

| x | No |
|---|---|
|  | Yes, How treated?: |

History of arthritis:

# Correctional Managed Care
## NURSING PROTOCOL  FOR
## CONTUSIONS & BITES OTHER THAN SNAKES

**Patient Name:** SALDIVAR, YOLANDA   **TDCJ#:** 733126   **Date:** 05/30/2015 21:28   **Facility:** MT. VIEW (MV)

| x | Contusion | | Abrasion | | Puncture |
|---|---|---|---|---|---|

| Location of Injury: right side of head | Date and Time of Injury:5.27.2015 at 0400 |
|---|---|
| Cause of Injury: she fell off the top bunk and hit her head on the wall | |

Type of Bite:NA

| | Insect | | Human (Identify individual) | | | |
|---|---|---|---|---|---|---|
| | Animal (Identify if Species Known) | | | Wild | | Domestic |

## OBJECTIVE DATA:

Skin:

| x | Warm | | Hot | x | Dry | | Clammy |
|---|---|---|---|---|---|---|---|
| | Pale | | Flushed | | Blister | | Redness |

Wound Types:

| x | Contusion | | Abrasion | | Puncture | | Bite |
|---|---|---|---|---|---|---|---|
| | Other: | | | | | | |

Drainage: NA

| Amount: | Color/Consistency: |
|---|---|
| Describe Wound: | |

Functional Impairment of body Parts?

| x | No |
|---|---|
| | Yes – Describe: |

Breath sounds auscultation:

Left:

| x | Clear | | Wheezes | | Crackles | | Diminished | | Absent |
|---|---|---|---|---|---|---|---|---|---|
| x | Upper lobe | x | Mid lobe | x | Lower lobe | | | | |

Right:

| x | Clear | | Wheezes | | Crackles | | Diminished | | Absent |
|---|---|---|---|---|---|---|---|---|---|
| x | Upper lobe | x | Mid lobe | x | Lower lobe | | | | |

Facial Appearance:

| | N/A | x | Normal |
|---|---|---|---|
| | Abnormal (Describe): | | |

Mental Status:

| x | Alert | x | Oriented | | Drowsy | | Unresponsive |
|---|---|---|---|---|---|---|---|

**Patient Name:** SALDIVAR, YOLANDA   **TDCJ#:** 733126   **Date:** 05/26/2015 04:44   **Facility:** MT. VIEW (MV)

| | Normal | | Limp | | Guarded | |
|---|---|---|---|---|---|---|
| x | | | | | | |

Posture:

| x | Normal | | Erect | | Tilts Right | | Tilts Left |
|---|---|---|---|---|---|---|---|
| | Sits Easily | | | Sits with Difficulty | | Guarded | |

Peripheral pulses:
Present

| x | RUE | x | LUE | x | RLE | x | LLE |
|---|---|---|---|---|---|---|---|

Absent

| | RUE | | LUE | | RLE | | LLE |
|---|---|---|---|---|---|---|---|

Peripheral edema:
Present

| | RUE | | LUE | | RLE | | LLE |
|---|---|---|---|---|---|---|---|

Absent

| x | RUE | x | LUE | x | RLE | x | LLE |
|---|---|---|---|---|---|---|---|

Pain is present in the lower back and/or flank area.

| | Yes – Perform a urine dipstick and notify provider of abnormal findings |
|---|---|
| x | No – skip to next section |

| Dipstick Urine Results: | |
|---|---|
| Color | |
| Glucose | |
| Bilirubin | |
| Ketone | |
| Specific Gravity | |
| Blood | |
| Ph | |
| Protein | |
| Urobilinogen | |
| Nitrites | |
| Leukocytes | |

Comments:_____

**NURSING ACTION:** If protocol completed by LVN, consultation completed with:
(enter name)

| RN: | Provider: |
|---|---|

**TREATMENT PLAN:**

**Patient Name:** SALDIVAR, YOLANDA   **TDCJ#:** 733126   **Date:** 05/30/2015 21:28  **Facility:** MT. VIEW (MV)

| | |
|---|---|
| Diphenhydramine 25 mg by mouth one time only | |

## REFER TO SPECIFIC COMPLAINT FOR TREATMENT PROTOCOL

### ACUTE CONTUSION

| | |
|---|---|
| Apply ice pack & give pass for refill every 4 hrs x 24 hrs | |

### INSECT/SPIDER BITE

| | |
|---|---|
| Remove any stinger using forceps, being careful not to squeeze stinger thereby injecting more venom. | |
| Apply ice pack to sting/bite. | |
| Apply Calamine Lotion to insect stings as necessary. | |
| Request that insect be brought to clinic/ER for identification if available. | |

### ANIMAL BITE

| | |
|---|---|
| Call the Office of Public Health (936) 437-3571 to report and seek guidance for determination of rabies prophylaxis. | |
| Contact local Animal Control Authorities to report. | |
| If a local reaction is observed with minimal swelling and/or erythema, V/S within above stated parameters and no shortness of breath, then wash wound thoroughly but gently with warm soap and water. | |
| If edema is present and extremity involved, elevate and apply ice pack. | |
| Apply dry, sterile dressing (small puncture wounds may be left open and gently irrigated). Schedule daily dressing changes as needed. | |
| Return to clinic the following day for re-evaluation. | |
| Refer chart to CID nurse. | |

### HUMAN BITE

| | |
|---|---|
| Wash wound thoroughly but gently with warm soap and water. | |
| Apply dry, sterile dressing (small puncture wounds may be left open and gently irrigated). Schedule daily dressing changes as needed. | |
| Return to clinic the following day for re-evaluation. | |
| Refer chart to CID nurse. | |
| Contact a provider if the skin is broken. | |
| Implement the contents of Infection Control Policy B-14.06 *Management of Offender Bloodborne Exposures* | |

**PATIENT EDUCATION: increase oral fluids.**
**Nursing does not have the ability to refer an offender to neurology. Offender must be seen by MD, NP or PA. This nurse cannot change bunk restriction for tonight or over the weekend. Count room is not here. Offender will have to wait until seen by provider. Nurse will write a pass for offender to have mattress on the floor so she might obtain some sleep instead of sleeping upright at the table.**

Patient's Learning Preferences

| x | Verbal | | Visual | | Other |
|---|---|---|---|---|---|
| Comment: | | | | | |

Ability to Learn:

| | Impaired | x | Non-impaired |
|---|---|---|---|
| Comment: | | | |

Readiness to Learn:

**Correctional Managed Care**
**NURSING PROTOCOL FOR**
**MUSCULOSKELETAL SYMPTOMS**

**Patient Name:** SALDIVAR, YOLANDA    **TDCJ#:** 733126    **Date:** 05/26/2015 04:44    **Facility:** MT. VIEW (MV)

Ability to Learn:

|   | Impaired | x | Non-impaired |
|---|----------|---|--------------|
| Comment: | | | |

Readiness to Learn:

| x | Cooperative |   | Uncooperative |
|---|-------------|---|---------------|

- •Elevate extremity above heart as much as possible.
- •Limit physical activity or sports.

### Final Disposition

Disposition:

| x | Release to Security |
|---|---------------------|
|   | Refer to provider for same day appointment |
|   | Other: |
|   | Issue pass to return to clinic for appointment the next day (operational hrs) |
|   | Refer to provider for ATC #9 |
|   | Email sent to appropriate staff for appointment within 10 days of sick call request |
|   | Resubmit sick call request or notify nurse if symptoms not resolved |

Condition on Discharge:

|   | Improved | x | Stable |
|---|----------|---|--------|

Procedures Ordered:

| Date Time | Description | Diagnosis | Comments | Special Instructions |
|-----------|-------------|-----------|----------|----------------------|
| 5/26/2015 04:49AM | #NURSING LEVEL 2 COMPLETE VISIT (F) | other musculoskeletal symptoms - limb | | |

Electronically Signed by ROARK, DEBRA L. R.N. on 05/26/2015.
##And No Others##

# E  X  H  I  B  I  T

## "D"

```
                    TDCJ - INSTITUTIONAL DIVISION
                        OFFICIAL LAYIN PASS
                            INFIRMARY

    EFFECTIVE DATE: 05/27/2015
    FROM-TO TIME: 09:00-09:30
    START DATE: 05/27/2015 END DATE: 05/27/2015

ADMIT: 00733126 SALDIVAR.YOLANDA
   REASON: NURSE SICKCALL    HOUSE: AP-02

   JOB: PROT CUST LEVEL I                00:00-00:00
   EDUC:


   COUNTROOM: B.BLANCHARD

   TITLE: AAII
```

## E X H I B I T

### "E"

*In Memory Of*

*Juanita G. Saldivar*

*January 8, 1932*
*May 3, 2015*

*I thank you for the love that each
has shown, but now it's time I
travel on alone. So grieve a while
for me if grieve you must, then let
your grief be comforted by trust.
It's only a while that we must
part, so bless the memories within
your heart. I won't be far away;
I'll be quite near. Just call me
softly and I will hear.*

*M.E. Rodriguez Funeral Home*

# E  X  H  I  B  I  T

## "F"



**OFFENDER MEDICAL PASS**

**Name:** SALDIVAR, YOLANDA    **TDCJ#:** 733126    **Facility:** MT. VIEW (MV)  **Date:** 05/30/2015 21:21
**Age:** 54 year **Race:** H **Sex:** female

# May place mattress on the floor until seen by provider.

Pass expires when seen by provider for bottom bunk request.

Electronically Signed by ROARK, DEBRA L. R.N. on 05/30/2015.
##And No Others##

E    X    H    I    B    I    T        "G"

TDCJ - INSTITUTIONAL DIVISION
OFFICIAL LAYIN PASS
ADMINISTRATIVE

EFFECTIVE DATE: 06/04/2015
FROM-TO TIME: 08:00-10:00
START DATE: 06/04/2015 END DATE: 06/05/2015

ADMID: 00733126 BALDIVAR,YOLANDA
REASON: 0800 VISIT        HOUSE: A4-02
BLDG:

JOB: PRNT CUST LEVEL I              00:00-00:00

COUNTROOM: G.BLANCHARD

TITLE: A911

E  X  H  I  B  I  T      "H"

# CORRECTIONAL MANAGED CARE
## CLINIC NOTES - NURSING

**Patient Name:** SALDIVAR, YOLANDA  **TDCJ#:** 733126  **Date:** 06/04/2015 12:04  **Facility:** MT. VIEW (MV)
**Age:** 54 year  **Race:** H  **Sex:** female
**Most recent vitals from 6/4/2015:** BP: 140 / 84 (Sitting) ; Wt: 174 Lbs.; Height: 58.5 In.; Pulse: 102 (Sitting) ;
Resp: 18 / min; Temp: 97.5 (Oral)  BMI: 36
**DOI:** 11/22/1995
**Allergies:** NO KNOWN ALLERGIES

| Patient Language: ENGLISH  Name of interpreter, if required: |
|---|

**Current Medications:**

| | | |
|---|---|---|
| **hydroCHLOROthiazide 25MG TAB**<br>1 TABS ORAL DAILY for 30 Days KOP | ORDERING FACILITY: MT. VIEW (MV)<br>ORDERING PROVIDER: HAYES, ALEXIS E | LAST DATE GIVEN KOP: 06/02/2015 12:56:30PM<br>REFILLS: 2 / 11<br>EXPIRATION DATE: 3/28/2016 08:56:00AM |
| **LEVOTHYROXINE 0.025MG TABLET**<br>1 TABS ORAL DAILY for 30 Days KOP | ORDERING FACILITY: MT. VIEW (MV)<br>ORDERING PROVIDER: HAYES, ALEXIS E | LAST DATE GIVEN KOP: 05/16/2015 03:47:56PM<br>REFILLS: 2 / 11<br>EXPIRATION DATE: 3/11/2016 08:56:00AM |
| **LEVOTHYROXINE 0.05MG TABLET**<br>1 TABS ORAL DAILY for 30 Days KOP | ORDERING FACILITY: MT. VIEW (MV)<br>ORDERING PROVIDER: HAYES, ALEXIS E | LAST DATE GIVEN KOP: 05/16/2015 03:47:56PM<br>REFILLS: 2 / 11<br>EXPIRATION DATE: 3/11/2016 08:57:00AM |
| **METOPROLOL 50MG TABLET**<br>1 TABS ORAL TWICE DAILY for 30<br>Days KOP | ORDERING FACILITY: MT. VIEW (MV)<br>ORDERING PROVIDER: HAYES, ALEXIS E | LAST DATE GIVEN KOP: 02/15/2015 04:40:11AM<br>REFILLS: 7 / 11<br><br>EXPIRATION DATE: 11/01/2015 10:25:00AM |
| **OMEPRAZOLE 20MG CAPSULE**<br>1 CAPS ORAL DAILY for 30 Days KOP | ORDERING FACILITY: MT. VIEW (MV)<br>ORDERING PROVIDER: HAYES, ALEXIS E | LAST DATE GIVEN KOP: 05/17/2015 06:16:34AM<br>REFILLS: 1 / 11<br>EXPIRATION DATE: 4/10/2016 08:57:00AM |

| **SCR INITIATED?** | | YES | Date Received: |
|---|---|---|---|
| | x | NO | |

# CORRECTIONAL MANAGED CARE
## CLINIC NOTES - NURSING

**Patient Name:** SALDIVAR, YOLANDA  **TDCJ#:** 733126  **Date:** 06/04/2015 12:04  **Facility:** MT. VIEW (MV)

**Plan is as follows:** I received a call from security in visitation at 0945 this a.m. saying that this offender vomited during visitation. She has been complaining of a headache off and on since falling off her bunk last week and hitting her head. She did not want to end her visit. I mentioned that security could bring her after her visit if she wanted to do this but the officer said they were short and would take her back to her cell. Warden Franks called later and asked why medical didn't want to see the offender. I told her security could bring her when they get someone who can do it to bring her.
Security brought her about 11:45 a.m. and Dr. Burleson saw her at that time.
**Offender was sent by van to CMH. See provider note.**
Procedures Ordered:

| Date Time | Description | Diagnosis | Comments | Special Instructions |
|---|---|---|---|---|
| 6/4/2015 01:01PM | #NURSING LEVEL 1 COMPLETE VISIT (F) | misc diagnosis | | |

Electronically Signed by BOOTH, PAMELA D. R.N. on 06/04/2015.
##And No Others##

# CORRECTIONAL MANAGED CARE
## CLINIC NOTES

**Patient Name:** SALDIVAR, YOLANDA  **TDCJ#:** 733126  **Date:** 06/04/2015 11:14  **Facility:** MT. VIEW (MV)
**Age:** 54 year  **Race:** H  **Sex:** female
**Most recent vitals from 5/30/2015:** BP: 137 / 76 (Standing) 119 / 61 (Sitting) ; Wt: 171 Lbs.; Height: 58.5 In.; Pulse: 79 (Standing) 74 (Sitting) ; Resp: 14 / min; Temp: 97.4 (Oral)  BMI: 35
**DOI:** 11/22/1995
*CURRENT* PEAK FLOWS: PF 1: ; PF 2: ; PF 3:
*PRIOR* PEAK FLOWS: PF1 : ; PF 2: ; PF 3:
**Allergies:** NO KNOWN ALLERGIES

| Patient Language:  ENGLISH  Name of interpreter, if required: |
|---|

Current Medications:

| | | |
|---|---|---|
| **hydroCHLOROthiazide 25MG TAB** <br> 1 TABS ORAL DAILY for 30 Days KOP | ORDERING FACILITY: MT. VIEW (MV) <br> ORDERING PROVIDER: HAYES, ALEXIS E | LAST DATE GIVEN KOP: 06/02/2015 12:56:30PM <br> REFILLS: 2 / 11 <br> EXPIRATION DATE: 3/28/2016 08:56:00AM |
| **LEVOTHYROXINE 0.025MG TABLET** <br> 1 TABS ORAL DAILY for 30 Days KOP | ORDERING FACILITY: MT. VIEW (MV) <br> ORDERING PROVIDER: HAYES, ALEXIS E | LAST DATE GIVEN KOP: 05/16/2015 03:47:56PM <br> REFILLS: 2 / 11 <br> EXPIRATION DATE: 3/11/2016 08:56:00AM |
| **LEVOTHYROXINE 0.05MG TABLET** <br> 1 TABS ORAL DAILY for 30 Days KOP | ORDERING FACILITY: MT. VIEW (MV) <br> ORDERING PROVIDER: HAYES, ALEXIS E | LAST DATE GIVEN KOP: 05/16/2015 03:47:56PM <br> REFILLS: 2 / 11 <br> EXPIRATION DATE: 3/11/2016 08:57:00AM |
| **METOPROLOL 50MG TABLET** <br> 1 TABS ORAL TWICE DAILY for 30 Days KOP | ORDERING FACILITY: MT. VIEW (MV) <br> ORDERING PROVIDER: HAYES, ALEXIS E | LAST DATE GIVEN KOP: 02/15/2015 04:40:11AM <br> REFILLS: 7 / 11 <br><br> EXPIRATION DATE: 11/01/2015 10:25:00AM |
| **OMEPRAZOLE 20MG CAPSULE** <br> 1 CAPS ORAL DAILY for 30 Days KOP | ORDERING FACILITY: MT. VIEW (MV) <br> ORDERING PROVIDER: HAYES, ALEXIS E | LAST DATE GIVEN KOP: 05/17/2015 06:16:34AM <br> REFILLS: 1 / 11 <br> EXPIRATION DATE: 4/10/2016 08:57:00AM |

**Today's Problem:**  Headache Nausea and Vomiting s/ p fall from upper bunk on 5/26/2015.
**6/4/2015**
**S:**  As above.

**O:**  CHAPERONE: Ms. Booth
Fundiscopic exam some disc congestion bilaterally
Neurologic Exam: unremarkable except for above.

**A:**  Headache/Nausea/Vomiting

**Plan is as follows:**
Spoke with Brandon at UTMB UR and obtained authorization for evaluation at CMH Authorization #

Please call nursing repo~~ ~~ ~~

Pleas~~ ~~

**Patient Name:** SALDIVAR, YOLANDA   **TDCJ#:** 733126   **Date:** 06/04/2015 11:14   **Facility:** MT. VIEW (MV)

| Date Time | Description | Diagnosis | Comments | Special Instructions |
|---|---|---|---|---|
| 6/4/2015 11:33AM | PROVIDER1-BRIEF OFFICE VISIT (F) | headaches, nausea & vomiting | | |

Electronically Signed by BURLESON, JAMES D. M.D. on 06/04/2015.
Electronically Signed by ROARK, DEBRA L. R.N. on 06/04/2015.
##And No Others##

E    X    H    I    B    I    T        "I"

Scanned by PILKINGTON, DEBORAH (DEBBIE) L, CCA in facility MT. VIEW (MV) on 06/05/2015 11:31

```
DA00074 /MVUB/HS09      TEXAS DEPARTMENT OF CRIMINAL JUSTICE        12·34:11
                        HEALTH SUMMARY FOR CLASSIFICATION           06/04/2015
```

```
    NAME  SALDIVAR,YOLANDA              DOB: 09/19/1960       P U L H E S
    TDCJ#. 00733126   SID#: 05422564    WGT: 171 LBS          -----------
    UNIT: MV        HOUSING· UNASGN-     HGT: 4'08"           |2|1|3|1|1|1|

    JOB: PROT CUST LEVEL I                                   |B|A|E|A|A|A|

                                                            |P| |T| | |H|

                                                             -----------
```

I.   FACILITY ASSIGNMENT (CHECK ONE)
X  A. NO RESTRICTION
__ B. BARRIER-FREE FACILITY
   C  SINGLE LEVEL FACILITY
   D. SUITABLE FOR TRUSTEE CAMP?   X YES__NO

II. HOUSING ASSIGNMENT
A. BASIC HOUSING (CHECK ONE)              B. BUNK ASSIGNMENT (CHECK ONE)
X  1  NO RESTRICTION                      __ 1. NO RESTRICTION
__ 2. SINGLE CELL ONLY                    00 2. LOWER ONLY
__ 3. SPECIAL HOUSING (HOUSING WITH
       LIKE MEDICAL CONDITION             __ 5. EXTENDED HOURS MH
   4  CELL BLOCK ONLY                     __ 6. EXTENDED HOURS INSULIN
C  ROW ASSIGNMENT (CHECK ONE)             D  WHEELCHAIR USE (CHECK ONE)
X  1. NO RESTRICTION                      __ 1  NO RESTRICTION
__ 2. GROUND FLOOR ONLY                   __ 2  PHOP ORDERED
                                          __ 3. UTILITY USE

III.WORK ASSIGNMENT/RESTRICTIONS (CHECK ALL THAT APPLY)
__ 1  MEDICALLY UNASSIGNED             __ 15.NO FOOD SERVICE
__ 2  PSYCHIATRICALLY UNASSIGNED       __ 16.NO REPETITIVE USE OF HANDS
__ 3  SEDENTARY WORK ONLY              __ 17.NO WALK WET/UNEVEN SURFACES
__ 4. FOUR HOUR WORK RESTRICTION       __ 18.DO NOT ASSIGN TO MEDICAL
__ 6. EXCUSE FROM SCHOOL               __ 19.NO WORK IN DIRECT SUNLIGHT
__ 7. LIMITED STANDING                 __ 20.NO TEMPERATURE EXTREMES
__ 8. NO WALKING > ___ YARDS           __ 21.NO HUMIDITY EXTREMES
__ 9. NO LIFTING > ___ LBS.            __ 22.NO EXPOSURE TO ENVIRONMENT POLLUTANTS
__ 10 NO BENDING AT WAIST              __ 23.NO WORK WITH CHEMICALS OR IRRITANTS
__ 11.NO REPETITIVE SQUATTING          __ 24 NO WORK REQUIRING SAFETY BOOTS

E    X    H    I    B    I    T    "J"

Patient Name:     SALDIVAR, YOLANDA
Episode#:         95790-0002

## Emergency Department Note

PAST HISTORY
Problems:
Abnormal Liver Function Test.
Gastroesophageal Reflux Disease.
Tachycardia.
Hypothyroidism.
Hypertension.
Hyperlipidemia.

Additional Surgeries:
no known surgeries.

Medications:
See centriq.
Allergies:
Pravastatin.
Ranitidine.

SOCIAL HISTORY
Nonsmoker.  No alcohol use or drug use.  Residence: prisoner.

ADDITIONAL NOTES
The nursing notes have been reviewed.

PHYSICAL EXAM
Vital Signs: Have been reviewed.  Blood pressure: 145/78- hypertensive.
Heart rate: 114- tachycardic.  Respiratory rate normal.  Temperature normal.
Oxygen saturation: 95%- oxygen saturation low.
Appearance: Alert.  No acute distress.  (tender right parietal).
Eyes: Pupils equal, round and reactive to light.  Eyes normal inspection.
ENT: Ears normal.  Nose normal.  Pharynx normal.
Neck: Normal inspection.  Neck supple.
Respiratory: No respiratory distress.
Neuro: Oriented X 3.  Alert.  Mood/affect normal.  Speech normal.  Cranial
nerves normal (as tested).  No cerebellar findings.  No motor deficit.  No
sensory deficit.  Reflexes normal.

LABS, X-RAYS, AND EKG
Laboratory Tests:
CT Brain:    (COLL: 06/04/2015 13:57)        ( MsgRcvd 06/04/2015 13:57) Final
results

    **Exam**
    RAD

    Coryell Memorial
    Healthcare System

Patient Name:      SALDIVAR, YOLANDA
Episode#:         95790-0002

## Emergency Department Note

DIAGNOSTIC IMAGING REPORT
""

PATIENT NAME:  SALDIVAR, YOLANDA
DOB:  09/19/1960VISIT#: 957900002
MEDICAL RECORD #:  95790DATE OF STUDY:  06/04/2015
ORDERING PHYSICIAN: SCHLABACH, JOHN CARLYLE  MD
STUDY PERFORMED:  CT Brain
REASON FOR EXAM:  head injury, headache vomiting
""

TECHNIQUE:
Axial images of the head were obtained without contrast.
""

FINDINGS:
The ventricles are normal in size, shape, and position.  There is no
evidence of intracranial hemorrhage, infarction, or mass. There are
calcifications in both basal ganglia regions suggesting physiologic
calcification.  There are tiny calcifications in the cerebellum which may
represent previous infectious process.  There are calcifications of the falx.
The visualized paranasal sinuses are clear bilaterally.  No acute bone
abnormalities are identified.
""

IMPRESSION:
""

1. No acute intracranial abnormalities are identified.
2. Findings were discussed with Dr. Schlabach on 06/04/2015 at 01:55 p.m.
""
""
""
""

Kevin W. Dwyer, MD
Thank you for allowing us to participate in the care of your patient.
This final report e-signed and authenticated by physician on Jun  4 2015
1:57PM.
""
""
""

head injury, headache vomiting

PROGRESS AND PROCEDURES
Course of Care: 15:09 06/04/15. headache and nausea improved after reglan and
benadryl.

Patient/family counseled.

Patient Name:  SALDIVAR, YOLANDA
Episode#:      95790-0002

## Emergency Department Note

Disposition: Discharged.  Condition: stable.

CLINICAL IMPRESSION
Headache.
Concussion.

INSTRUCTIONS
(patient is to avoid strenuous physical and mental work for a few days,
gradually increasing it as she feels better.  I recommend that she get pain
medicine and nausea medicine as needed.).

Warnings: GENERAL WARNINGS: Return or contact your physician immediately if
your condition worsens or changes unexpectedly, if not improving as expected,
or if other problems arise.

(Electronically signed by Carlyle Schlabach, M.D. 06/05/2015 5:51)

Dictated By: SCHLABACH, CARLYLE          Transcribed date: 06/04/15  12:27
                                         Transcribed by:   T-System, Interface

## Coryell Memorial Healthcare System

### Emergency Department Visit Record

| | | |
|---|---|---|
| Patient Name | : | SALDIVAR, YOLANDA |
| MRN | : | 95790 |
| DOB | : | 09/19/1960 [55 years] |
| Visit | : | 95790-0002 |
| Sex | : | Female |
| Admission Date/Time | : | 06/04/2015 12:27 |

### Patient Data

| | | |
|---|---|---|
| Chief Complaint | : | Headache |
| Triage Time | : | 06/04/2015 12:35 |
| Triage Level | : | 3 - Urgent |
| Physician | : | - |
| Registered Nurse | : | - |
| Technician | : | - |
| Bed | : | TRA-6 |
| Pain Scale | : | 6 |

### First Vital Signs

| Date/Time | HR | BP(mm/Hg) | Temp(F) | Resp | SpO2(%) | O2 Device | O2 Amount | BS | Pain Scale | Ht/Length(in) | Wt(lb/oz) | BMI | Head Circum.(in) | Entered By |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/04/2015 12:35 | 114 | 145/78 | 98 | 16 | 95 | Room Air | | | | 58 | 174/0 | 36.37 | | SAUNDERS, CRYSTAL |

### Allergies

| Allergy Name | Assessed By | Last Action On | Activated Date |
|---|---|---|---|
| PRAVASTATIN SODIUM 10 MG Tablet | SAUNDERS, CRYSTAL | 06/04/2015 00:00 | 06/04/2015 00:00 |
| ZANTAC [Ranitidine HCl] 150 MG Tablet | SAUNDERS, CRYSTAL | 06/04/2015 00:00 | 06/04/2015 00:00 |

**Stages Of Care**

**Staff Appointments**

**Provider**

      Provider Notified Time    :   06/04/2015 12:40
      Provider Arrival Time     :   06/04/2015 13:00

**Chief Complaint**

      Stated Complaint       :   FELL FROM TOP BUNK ON 5/26 AND HIT RIGHT SIDE OF HEAD. HAS BEEN C/O HEADACHE SINCE THEN AND BEGAN VOMITING THIS AM. PROVIDER WANTED TO R/O HEAD INJURY.
      Historian                :   Patient

| Body System | Complaint |
| --- | --- |
| Neuro | Headache |

**Treatment Prior to Arrival**

      Arrival Mode          :   TDCJ Van

| Treatment Name | Route | Dose |
| --- | --- | --- |
| C-Collar | | |

**Immediate Treatment**

**Treatment**
      Bed                     :   TRA-6

**Surgical History**

**Family History**

**Past Medical History**

**Existing Conditions**

      Headache, unspec.

**Assessment and Plan**

## Allergies

PRAVASTATIN SODIUM 10 MG Tablet Unknown with: Rash
ZANTAC [Ranitidine HCl] 150 MG Tablet Unknown with: Rash
Allergy band placed on patient  :  No

## Medication History

| Medication Name | Dose | Unit | Frequency | Assessed By | Start Date/Time | Source |
|---|---|---|---|---|---|---|
| omeprazole(omeprazole) 20 mg tablet,delayed release (DR/EC) | 1 tablet | tablet | once a day | saun8765 | | ePrescription |
| metoprolol tartrate(metoprolol tartrate) 50 mg tablet | 1 tablet | tablet | twice a day as directed | saun8765 | | ePrescription |
| levothyroxine(levothyroxine) 50 mcg tablet | 1 tablet | tablet | once a day as directed | saun8765 | | ePrescription |
| levothyroxine(levothyroxine) 25 mcg tablet | 1 tablet | tablet | once a day | saun8765 | | ePrescription |
| hydrochlorothiazide(hydrochlorothiazide) 25 mg tablet | 1 tablet | tablet | once a day as directed | saun8765 | | ePrescription |

## Triage Pain Assessments

| Body System | Numerical Pain Scale | Duration | Location |
|---|---|---|---|
| Neuro | 6 | 7Days | HEADACHE |

## Assessments

| Name | : ED Neurological Assessment (with GCS) (Archived Version 09/14/2015 14:39:26) |
|---|---|
| Charted Date | : 06/04/2015 12:43 |
| Entered By | : SAUNDERS, CRYSTAL |

Oriented to Time
Oriented to Situation
Response to Stimuli                          :   Purposeful
Speech                                       :   Clear

**Motor evaluation**
Handgrasp right                              :   Strong
Handgrasp left                               :   Strong
Arm movement right                           :   Strong
Arm movement left                            :   Strong
Leg movement right                           :   Strong
Leg movement left                            :   Strong

**Pupil evaluation**
Right reactive                               :   Brisk
Left reactive                                :   Brisk

**Pain**
Rating                                       :   6
Location                                     :   HEADACHE AND VOMITING X 1

**Suicide Screen (adult >21)**
1. Have you ever had feelings of
overwhelming sadness or do you               :   No
presently have these feelings?

**Substance Use**
Smoking History                              :   Never Smoker
Cessation Education                          :   Given
Alcohol Use                                  :   None
Illegal or Non-Prescribed Drug Use           :   No

**Glascow Coma Scale**
Best eye response                            :   4  = Eye opening spontaneously
Best motor response                          :   5  = Localizes to noxious stimuli
Best verbal response                         :   6  = Obeys commands
Total GCS score                              :   15

| 06/04/2015 15:35 | ROBELLO, THOMAS | ED Nursing Note | IV DCED. CATHETER INTACT. DISCHARGE INSTRUCTIONS AND MEDICAL SUMMARY GIVEN TO PT AND GUARDS. |
|---|---|---|---|

| Signed By : ROBELLO, THOMAS | Signed On : 06/04/2015 15:40 | Cosigned By : | Cosigned On : |
|---|---|---|---|

| 06/04/2015 15:15 | ROBELLO, THOMAS | ED Nursing Note | HEADACHE 2/10 AT THIS TIME. |
|---|---|---|---|

| Signed By : ROBELLO, THOMAS | Signed On : 06/04/2015 15:28 | Cosigned By : | Cosigned On : |
|---|---|---|---|

| 06/04/2015 14:45 | ROBELLO, THOMAS | ED Nursing Note | NO REQUESTS OR COMPLAINTS MADE. HEADACHE 4/10. |
|---|---|---|---|

| Signed By : ROBELLO, THOMAS | Signed On : 06/04/2015 15:29 | Cosigned By : | Cosigned On : |
|---|---|---|---|

| 06/04/2015 14:17 | ROBELLO, THOMAS | ED Nursing Note | BENADRYL GIVEN SIVP AT THIS TIME. REGLAN PUT IN 100ML OF NS TO RUN OVER 10MIN. |
|---|---|---|---|

| Signed By : ROBELLO, THOMAS | Signed On : 06/04/2015 14:18 | Cosigned By : | Cosigned On : |
|---|---|---|---|

| 06/04/2015 14:10 | ROBELLO, THOMAS | ED Nursing Note | IV SL 20G STARTED BY CURTIS IV X1. PT TOLERATED WELL. |
|---|---|---|---|

| Signed By : ROBELLO, THOMAS | Signed On : 06/04/2015 14:17 | Cosigned By : | Cosigned On : |
|---|---|---|---|

| 06/04/2015 13:33 | ROBELLO, THOMAS | ED Nursing Note | PT TO CT VIA W/C AT THIS TIME. |
|---|---|---|---|

| Signed By : ROBELLO, THOMAS | Signed On : 06/04/2015 13:33 | Cosigned By : | Cosigned On : |
|---|---|---|---|

| 06/04/2015 13:24 | ROBELLO, THOMAS | ED Nursing Note | WAITING ON CT SCAN. NO CHANGE IN CONDITION. DOCTOR AT BEDSIDE AT THIS TIME. |
|---|---|---|---|

| Signed By : ROBELLO, THOMAS | Signed On : 06/04/2015 13:25 | Cosigned By : | Cosigned On : |
|---|---|---|---|

| 06/04/2015 12:35 | SAUNDERS, CRYSTAL | ED Nursing Note | TO ER BED 6 VIA AMBULATION, MONITOR APPLIED, MD NOTIFIED. |
|---|---|---|---|

| Signed By : SAUNDERS, CRYSTAL | Signed On : 06/04/2015 12:44 | Cosigned By : | Cosigned On : |
|---|---|---|---|

| | | | |
|---|---|---|---|

## Vital Signs

| Date/Time | HR | Systolic(mm/Hg) | Diastolic(mm/Hg) | Temp(F) | T Method | Resp | SpO2(%) | O2 | BS | Pain Scale | Head Circum.(in) | By |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 06/04/2015 12:35 | 114 | 145 | 78 | 98 F | Oral | 16 | 95 % | Room Air | | | | SAUNDERS, CRYSTAL |
| 06/04/2015 13:00 | 88 | 132 | 72 | | | 18 | 94 % | Room Air | | | | ROBELLO, THOMAS |
| 06/04/2015 13:30 | 80 | 142 | 80 | | | 18 | 94 % | Room Air | | | | ROBELLO, THOMAS |
| 06/04/2015 14:00 | 89 | 129 | 68 | | | 18 | 94 % | Room Air | | | | ROBELLO, THOMAS |
| 06/04/2015 14:30 | 100 | 121 | 69 | | | 18 | 93 % | Room Air | | | | ROBELLO, THOMAS |
| 06/04/2015 15:00 | 100 | 122 | 60 | | | 18 | 94 % | Room Air | | | | ROBELLO, THOMAS |
| 06/04/2015 15:30 | 100 | 126 | 64 | | | 18 | 94 % | Room Air | | 2 | | ROBELLO, THOMAS |

## Intake/Output

**Intake:**

    Intake          : 0

**Output:**

    Output        : 0

**FluidBalance:**

    FluidBalance    : 0

**Other:**

    Other         : 0

## Orders

## Medication Order

### IV Site Info

No IV sites created

| Medication Order | : DIPHENHYDRAMINE HCL INJ [50 MG/ML] (BENADRYL) |
|---|---|
| Current Status | : Complete - 06/04/2015 14:16 |

| | | | | | |
|---|---|---|---|---|---|
| Created By | : SCHLABACH, CARLYLE | Created on | : 06/04/2015 13:33 | Receive Type | : Written |
| Ordering MD | : SCHLABACH, CARLYLE | Priority | : STAT | Frequency | : ONCE |
| Times | : 13:33 | Special Instructions | : ======================= *** FALL RISK *** ======================= | Location | : ED |
| Type | : Written | Duration | : 2 Days | Reason | : |
| Start DateTime | 06/04/2015 13:33 | Stop DateTime | 06/05/2015 23:59 | Strength | : 50 MG/ML Solution |
| Home Medication | : False | Route | : IVP  IV PUSH | Dosage | : 25 mg |
| Order Notes : - | | | | | |

**Diagnosis**

No items
available

**Administration**

    Started On    : 06/04/2015 14:16

    Administered By  : ROBELLO, THOMAS

    Route       : IVP  IV PUSH

    Administration Notes

        20G SL STARTED BY CURTIS AT 1410
        TO RIGHT AC.

**Medication Conflict :**
**Alerts**

| Conflicting Type : Dose Conflict | Conflict On | 06/04/2015 13:34 | Severity: | NotSet |
|---|---|---|---|---|
| Conflicting Message | : | Dosing Alerts BENADRYL 50 MG/ML Duration: Duration of 2 days exceeds the recommended duration of 1 days. reference USP-DI | | |
| Override Notes | : | NOTED AND CLEARED BY DR.SCHLABACK | | |

| Medication Order | : METOCLOPRAMIDE HCL INJ [10MG] (REGLAN 10 MG INJ) |
|---|---|
| Current Status | : Complete - 06/04/2015 14:16 |

| Created By | : SCHLABACH, CARLYLE | Created on | : 06/04/2015 13:34 | Receive Type: Written |
|---|---|---|---|---|
| Ordering MD | : SCHLABACH, CARLYLE | Priority | : STAT | Frequency : ONCE |
| Times | : 13:33 | Special Instructions | : | Location : ED |
| Type | : Written | Duration | : 2 Days | Reason : |
| Start DateTime | 06/04/2015 13:33 | Stop DateTime | 06/05/2015 23:59 | Strength : 5 MG/ML Solution |
| Home Medication | : False | Route | : IVP IV PUSH | Dosage : 10 mg |

Order Notes : -

**Diagnosis**
No items available

**Administration**

| Started On | : 06/04/2015 14:16 |
|---|---|
| Administered By | : ROBELLO, THOMAS |
| Route | : IVP IV PUSH |
| Administration Notes | : - |

**Medication Conflict :**
**Alerts**

| Conflicting Type : Dose Conflict | Conflict On | 06/04/2015 13:34 | Severity: | NotSet |
|---|---|---|---|---|
| Conflicting Message | : | Dosing Alerts REGLAN 10 MG INJ Daily Dose: 1 ml is below the recommended daily dose of 2 - 16 ml per day. | | |

RENAL IMPAIRMENT or HEPATIC
DYSFUNCTION may be the reason
the daily dose selected falls below
the recommended minimum value.
reference USP-DI

Override Notes        :

## Radiology Order

| Radiology Order | : 4230001CT (CT Brain) |
|---|---|
| Current Status | : Complete - 06/04/2015 13:42 |

| | | | | | |
|---|---|---|---|---|---|
| Created By | : SCHLABACH, CARLYLE | Created on | : 06/04/2015 12:57 | Receive Type | : Written |
| Ordering MD | : SCHLABACH, CARLYLE | Priority | : STAT | Frequency | : ONCE |
| Times | : 12:56 | Special Instructions | : | Location | : ED |
| Type | : Written | Duration | : 2 Days | Reason | : head injury, headache vomiting |
| Start DateTime | 06/04/2015 12:56 | Stop DateTime | 06/05/2015 23:59 | Strength | : |

Order Notes : -

**Diagnosis**
No items
available

**Radiology Results**

Transcribed By    : Healthland, Tech

Transcribed Date    : 06/04/2015 13:57

Findings : -
4230001CT (CT Brain)
**Radiology Report**

**PATIENT NAME:** SALDIVAR, YOLANDA
**DOB:** 09/19/1960        **VISIT#:** 957900002
**MEDICAL RECORD #:** 95790      **DATE OF STUDY:** 06/04/2015
**ORDERING PHYSICIAN:** SCHLABACH, JOHN CARLYLE MD
**STUDY PERFORMED:** CT Brain
**REASON FOR EXAM:** head injury, headache vomiting

TECHNIQUE:
Axial images of the head were obtained without contrast.

FINDINGS:
The ventricles are normal in size, shape, and position. There is no evidence of intracranial hemorrhage, infarction, or mass. There are calcifications in both basal ganglia regions suggesting physiologic calcification. There are tiny calcifications in the cerebellum which may represent previous infectious process. There are calcifications of the falx. The visualized paranasal sinuses are clear bilaterally. No acute bone abnormalities are identified.

IMPRESSION:

1. No acute intracranial abnormalities are identified.
2. Findings were discussed with Dr. Schlabach on 06/04/2015 at 01:55 p.m.

**Kevin W. Dwyer, MD**
Thank you for allowing us to participate in the care of your patient.
This final report e-signed and authenticated by physician on Jun 4 2015 1:57PM.

**Laboratory Order**

**Department Order**

| Department Order | : (Saline Lock) | | | | |
|---|---|---|---|---|---|
| **Current Status** | **: Complete - 06/04/2015 14:10** | | | | |
| Created By | : SCHLABACH, CARLYLE | Created on | : 06/04/2015 13:33 | Receive Type | : Written |
| Ordering MD | : SCHLABACH, CARLYLE | Priority | : STAT | Frequency | : ONCE |

| | | | | | |
|---|---|---|---|---|---|
| Times | : 13:33 | Special Instructions | : | Location | : ED |
| Type | : Written | Duration | : 2 Days | Reason | : |
| Start DateTime | 06/04/2015 13:33 | Stop DateTime | 06/05/2015 23:59 | Strength | : |

Order Notes : -

**Diagnosis**
No items
available

**Sign-off**

Signed-off On : 06/04/2015 14:10

Signed-off By : ROBELLO, THOMAS

Signed-off Notes
SL STARTED IN
RIGHT AC WITH
20G CATH BY
CURTIS.

**Respiratory Order**

# Disposition

Discharge Date/Time : 06/04/2015 15:30

Disposition Type : 21 - Discharged/Transferred to Court/Law Enforcement

Notes : -

E    X    H    I    B    I    T        "K"

*EMERGENCY GRIEVANCE*



# Texas Department of Criminal Justice

## STEP 1    OFFENDER GRIEVANCE FORM

Offender Name: __Yolanda Saldivar__    TDCJ # __733126__

Unit: __Mountain View__    Housing Assignment: __E-Dorm #2__

Unit where incident occurred: __Mountain View__

OFFICE USE ONLY

Grievance #: 2015145542

Date Received: 05/21/15

Date Due: 06-30-15

Grievance Code: 200

Investigator ID #: T13IN

Extension Date: _____

Date Retd to Offender: JUN 11 2015

---

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

Who did you talk to (name, title)? __Asked To Speak To Lt. Hocutt__    When? __5-20-15__

What was their response? __None__

What action was taken? __None__

---

State your grievance in the space provided. Please state who, what, when, where and disciplinary case number if appropriate.

On 5/20/15 offender Trump in cell #5 had problems with her toilet functioning. Maintenance was here at this time and informed Ms. Aguirre that they would go to Lunch and would Return to fix it. They never did. Instead, her toilet began getting worse. Officer Coble saw the problem, informed Sgt. Briggs who informed Lt. Hocutt who advised her to call Ms. Blanchard at the count Room to have offender Trump moved. They moved her to Cell #1 and moved me to cell #2, on a TOP BUNK. I have been on bottom Bunk Restriction by the standards of the TDCJ Count Room and Medical because I am BELOW the height appropriate for a Top Bunk. Offender Trump is 4 feet 11 inches And is Bottom Bunk Restricted, because of her height. I am 4 feet 10½ inches Tall, below trump's height. Yet, my height is the exception to the Rule To WHO? According To Ms. Coble, Nurse Fox informed her that my bottom Bunk Restriction expired in November, 2013. And for what Reason and By who's orders? I know I have not grown in height beyond that is appropriate for a Top Bunk. I have heart problems for which I take Lopressor, I have thyroid problems for which I take Thyroid Medicine, am on doctor's care for elevated liver enzymes that give me headaches and I am SHORTER than offender Trump. She is neither sick nor is taking any kind of medication and is taller than me. Yet, she gets preferential treatment. Lt. Hocutt and Sgt. Briggs didn't care to fix this issue, Lt. Hocutt would not even present himself in E-Dorm To evaluate the situation even though Ms. Coble informed him about it. I was placed in Cell #2, with NO RUNNING Water, it was hot and humid and neither

---

I-127 Front (Revised 9-1-2007)    YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM    (OVER)

Appendix F

Rank cared To Remedy the problem. Ms. Cobble Rigged the pipes in the pipe chase so I could have Running Water which stayed on Continously until the next morning. This whole situation is so pathetic, by those Left in charge to run this unit, this issue of placing me in a top Bunk with my health conditions as they are with no Running Water in a Hot day is clear that my physical safety was jeopardized deliberately, to injure me, this is cruel and unusual punishment, undeserving.

**Action Requested to resolve your Complaint.**

That I Be placed Back on Bottom Bunk Restriction.

**Offender Signature:** _Yolanda Saldin_     **Date:** 5-20-15

Grievance Response: On 5/20/15, you were assigned to cell 2 during the 60 day rotation for protective custody offenders. At that time you did not have a bottom bunk restriction, and you were properly assigned. On 6/4/15, you received a bottom bunk restriction from medical. Your housing assignment was changed accordingly.

**Signature Authority:** _____     **Date:** JUN 1 1 2015

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:**     **\*Resubmit this form when corrections are made.**
☐ 1. Grievable time period has expired.
☐ 2. Submission in excess of 1 every 7 days. \*
☐ 3. Originals not submitted. \*
☐ 4. Inappropriate/Excessive attachments. \*
☐ 5. No documented attempt at informal resolution. \*
☐ 6. No requested relief is stated. \*
☐ 7. Malicious use of vulgar, indecent, or physically threatening language. \*
☐ 8. The issue presented is not grievable.
☐ 9. Redundant, Refer to grievance #_____
☐ 10. Illegible/Incomprehensible. \*
☐ 11. Inappropriate. \*

**UGI Signature:** _____
**I-127 Back** (Revised 9-1-2007)

**OFFICE USE ONLY**

Initial Submission          UGI Initials:_____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____
**2nd Submission**          UGI Initials:_____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____
**3rd Submission**          UGI Initials:_____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____

Appendix F



**Texas Department of Criminal Justice**

# STEP 2    OFFENDER GRIEVANCE FORM

Rec'd @ UGI   SEP 0 8 2015

x

for which I received medical attention at the Coryell Memorial Hospital 10 DAYS after my head injury. FOR 10 days, Warden Nelson and those under her dismissed the objective danger before them that a TOP BUNK BED posed to me. It is irresponsible for Warden Nelson to ignore all these facts.

**Offender Signature:** _Yolanda Saldin_      **Date:** 6-11-15

**Grievance Response:**

**Your grievance has been reviewed and noted. Investigation revealed this issue was addressed at the Step 1 Level. No further action is warranted by this office.**

                         **F. Fuster, Asst. Reg. Director   August 19, 2015**

**Signature Authority:** _F. Fuster, ARD_           **Date:**

**Returned because:**    *Resubmit this form when corrections are made.*

- [ ] 1. Grievable time period has expired.
- [ ] 2. Illegible/Incomprehensible. *
- [ ] 3. Originals not submitted. *
- [ ] 4. Inappropriate/Excessive attachments. *
- [ ] 5. Malicious use of vulgar, indecent, or physically threatening language.
- [ ] 6. Inappropriate. *

**CGO Staff Signature:** _____

**OFFICE USE ONLY**

Initial Submission      CGO Initials:_____

Date UGI Recd:_____

Date CGO Recd:_____

  (check one) ____ Screened    ____ Improperly Submitted

Comments:_____

Date Returned to Offender:_____

2nd Submission      CGO Initials: _____

Date UGI Recd:_____

Date CGO Recd:_____

  (check one) ____ Screened    ____ Improperly Submitted

Comments:_____

Date Returned to Offender:_____

3rd Submission      CGO Initials:_____

Date UGI Recd:_____

Date CGO Recd:_____

  (check one) ____ Screened   ____ Improperly Submitted

Comments:_____

Date Returned to Offender:_____

E    X    H    I    B    I    T         "L"



5

# Texas Department of Criminal Justice

## STEP 1    OFFENDER GRIEVANCE FORM

OFFICE USE ONLY

Grievance #: 2015149867

Date Received: 05-29-15

Date Due: 07-08-15

Grievance Code: 637

Investigator ID #: I13V0

Extension Date: _____

Date Retd to Offender: JUL 02 2015

Offender Name: YOLANDA SALDIVAR    TDCJ # 733126

Unit: Mountain View    Housing Assignment: E-Dorm #2

Unit where incident occurred: Mountain View

---

You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.

Who did you talk to (name, title)? Ms. Davenport, Nurse NorthKett    When? 5-28-15

What was their response? That she would see me But never did, to place my mattress on the floor.

What action was taken? None,

---

State your grievance in the space provided. Please state who, what, when, where and disciplinary case number if appropriate.

On 5/26/15 I fell off my Top Bunk Bed To the floor, landed on my right hip, leg and hit hard the right side of my head. I was confused and wobbly when I got up. Officer Ishibi was a witness to my fall. The nurse was called. She saw me at 4:45 a.m., checked my blood pressure, pulse and oxygen and checked my eyes, gave me an ice pack and Tylenol for my head for 24 hours. I got a nurse sick call for 5/27/15. On 5/27/15 Nurse Ryan came to see me in E-Dorm, did not exam me but only spoke to me. I informed her that I was having headaches and was seeing objects lop-sided. She informed me that she would expedite my complaint, because I needed to see a neurologist immediately. Today, 5/28/15, I continued to have these headaches and dizziness. I informed Ms. Davenport at 6:30 a.m. who informed Nurse NorthKett who instructed Ms. Davenport To have me be sent to medical. Ms. Davenport stated I could not just go to medical for I needed to be escorted. Nurse NorthKett then stated I place my mattress on the floor and that she would see me in a little while. Because the nurse had not shown up, Ms. Davenport called the Nurse again at 2:00 pm and Ms. NorthKett stated for me to continue with my mattress on the floor and to drop a form to medical. Medical has not provided a physician to see for my post head injury. These headaches, dizziness and objects I see lop-sided have not been assessed or evaluated. A head injury is

---

I-127 Front (Revised 9-1-2007)    YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM    (OVER)

Appendix F

being dismissed as insignificant by medical. Post symptoms such as headaches and dizziness should be a concern after a concussion or blunt force trauma to the brain. Yet, medical acts in deliberate indifference to my care and well-being. Head injuries are just as important to be evaluated as is a broken leg or arm, diabetic coma, drug overdose and the like.

**Action Requested to resolve your Complaint.**

That medical evaluate me by a physician for my head injury and post symptoms.

Offender Signature: _Yolanda Baldwin_  Date: _5-28-15_

Grievance Response:

See attached behind OGOI

Signature Authority: _Angie Buro, SPM_  Date: _6-30-15_
If you are dissatisfied with the Step I response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:**  *Resubmit this form when corrections are made.
- [ ] 1. Grievable time period has expired.
- [ ] 2. Submission in excess of 1 every 7 days. *
- [ ] 3. Originals not submitted. *
- [ ] 4. Inappropriate/Excessive attachments. *
- [ ] 5. No documented attempt at informal resolution. *
- [ ] 6. No requested relief is stated. *
- [ ] 7. Malicious use of vulgar, indecent, or physically threatening language. *
- [ ] 8. The issue presented is not grievable.
- [ ] 9. Redundant, Refer to grievance #_____
- [ ] 10. Illegible/Incomprehensible. *
- [ ] 11. Inappropriate. *

UGI Signature: _____
I-127 Back (Revised 9-1-2007)

**OFFICE USE ONLY**

Initial Submission        UGI Initials:_____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender:_____

2nd Submission        UGI Initials:_____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____

3rd Submission        UGI Initials:_____
Grievance #: _____
Screening Criteria Used: _____
Date Recd from Offender: _____
Date Returned to Offender: _____

Appendix F

**GRIEVANCE RESPONSE:**

You dropped a form on 5/26/15 stating you needed your bottom bunk restriction renewed, however; the two HSM-18s that were in your chart at that time, 10/26/2004 and 11/13/13 both showed no bottom bunk restriction. You were seen by nursing cell side on 5/26/15 as a "walk-in" for complaint of slipping and falling when you were getting down from the top bunk – you stated you had a headache on the right side in the back and right hip pain - you were ordered Tylenol at that time by Ms. Roark, RN and released to security to return to your dorm. You were seen by Ms. Reinacher, LVN on 5/27/15 while she was doing E-dorm rounds. You stated to her that you still had a minor headache and that your bottom bunk had expired in November 2013. You stated to her that you "felt a little off" but denied any nausea or emesis episodes. She stated she would refer you to the provider and that he could refer you to neurologist if he felt it was needed. You were seen on 5/30/15 for the 5/26/15 sick call request. Ms. Roark, RN saw you at this time and informed you that you were not being neglected but that the medical department had only had a provider one day that week, she also told you that until you were seen by a provider you could place your mattress on the floor. You were referred by Ms. Roark for a provider appointment. You were seen by Dr. Burleson on 6/04/15 for your complaint of nausea and vomiting after falling from your top bunk on 5/26/15 – he had you transported to Coryell Memorial Hospital at this time for assessment. The hospital's notes state that the cause of your headache on that day is not clear but does not appear to be a serious illness. Dr. Burleson ordered you a lower bunk for an indefinite period of time. You dropped a sick call on 6/09/15 for complaint of continuing to have mild headaches – you were scheduled for a nurse sick call on 6/10/15 but refused the appointment.

AP-5



**Texas Department of Criminal Justice**

# STEP 2    OFFENDER
### GRIEVANCE FORM

Offender Name: YOLANDA SALDIVAR    TDCJ # 733126

Unit: Mountain View    Housing Assignment: #1 E-Dorm #5

Unit where incident occurred: Mountain View

Rec'd @ MV AUG 0 6 2015

OFFICE USE ONLY

Grievance #: 2015149864

UGI Rec'd Date: JUL 08 2015

HQ Rec'd Date: JUL 1 5 2015

Date Due: 8/24

Grievance Code: 637

Investigator ID #: _____

Extension Date: _____

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

**Give reason for appeal (Be specific).** *I am dissatisfied with the response at Step 1 because...*

Medical is being deceitful in their response. FIRST, Protective Custody offenders cannot just do a "walk-in" because we have to be escorted by 2 officers. TDCJ E-Dorm Records show I never left E-Dorm. On 5-26-15 after my fall and head injury, officer Sohebi called medical and Nurse Roark came to E-Dorm, to assess my condition. There was an incident report done confirming my fall and injury. It was not just a complaint. I was not released to return to my Dorm as I never went physically to medical. SECOND, on 5-30-15 I was escorted to medical NOT because of a 5/26/15 Request for a Bottom Bunk restriction (although this was still pending) for Ms. Reinacher saw me on 5/27/15 for that. My visit on this day (Saturday) was because I continued to complain of headaches and dizziness. THIRD, I was never seen by a provider UNTIL they (medical) were forced to see me when I got sick during my visitation with my family on 6/4/15. FOURTH, the notes sent back with me from Coryell Memorial Hospital, indicated I had a concussion. Those Hospital notes were given to LT. Howitt on my return. Medical may not think a Concussion is a serious illness. But it should not be taken lightly or as a non-serious illness. Head injuries are a serious matter.

I-128 Front (Revised 9-1-2007)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix G

**Offender Signature:** _Yolanda Sardin_                    **Date:** _7-8-15_

**Grievance Response:**
In your Step 1 Medical Grievance, you stated you fell from the top bunk on 05/26/2015 and hit the right side of your head, right hip and right leg. You stated you were denied medical care for your injuries. You stated you were having headaches and dizziness but you were not seen in a timely manner.

After a review of the grievance and clinical records, this office supports the findings in the Step 1 Medical grievance response. Documentation in the medical record indicates that you have been afforded access to proper medical care in accordance with Correctional Managed Health Care Policy E-37.1.

If you feel your situation requires further evaluation you are advised to submit a Sick Call Request to the medical department.

2.02

**Signature Authority:**         STEP II MEDICAL GRIEVANCE PROGRAM            **Date:** _7-20-15_
                                  OFFICE OF PROFESSIONAL STANDARDS
                                  ~~TDCJ HEALTH SERVICES DIVISION~~

**Returned because:**    *Resubmit this form when corrections are made.*

☐ 1. **Grievable time period has expired.**

☐ 2. **Illegible/Incomprehensible. \***

☐ 3. **Originals not submitted. \***

☐ 4. **Inappropriate/Excessive attachments. \***

☐ 5. **Malicious use of vulgar, indecent, or physically threatening language.**

☐ 6. **Inappropriate. \***

CGO Staff Signature: _____

**OFFICE USE ONLY**

Initial Submission                CGO Initials: _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ____ Screened    ____ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

2nd Submission                CGO Initials: _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ____ Screened    ____ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

3rd Submission                CGO Initials: _____

Date UGI Recd: _____

Date CGO Recd: _____

(check one) ____ Screened    ____ Improperly Submitted

Comments: _____

Date Returned to Offender: _____

E    X    H    I    B    I    T        "M"



# Texas Department of Criminal Justice

# STEP 1    OFFENDER GRIEVANCE FORM

**OFFICE USE ONLY**

Grievance #: 2015153771

Date Received: JUN 0 5 2015

Date Due: 7-15-15

Grievance Code: 804

Investigator ID #: D1310

Extension Date: _____

Date Retd to Offender: JUN 2 9 2015

**Offender Name:** Yolanda Saldivar    **TDCJ #** 733126

**Unit:** Mountain View    **Housing Assignment:** E-Dorm #2

**Unit where incident occurred:** Mountain View

---

**You must try to resolve your problem with a staff member before you submit a formal complaint. The only exception is when appealing the results of a disciplinary hearing.**

Who did you talk to (name, title)? Warden Nelson, Asst.Warden Franks    When? 5/28/15

What was their response? None

What action was taken? None

**State your grievance in the space provided. Please state who, what, when, where and disciplinary case number if appropriate.**

On 5/26/15 at 4:30 a.m., I suffered a fall from my TOP BUNK BED to the floor. I suffered a head injury. Officer Sohebi witnessed my fall and filed an incident report. Since then, I have NOT seen a doctor for my head injury. Symptoms of headaches, dizziness and feeling off balance have occurred to me since the injury. I have complained to many officers and nurses and Ranking officials including Warden Nelson, Assistant Warden Franks and Major Williams but to no avail. On 5/28/15 while Assistant Warden Franks and Major Williams made rounds, I spoke to them about my physical condition and the safety risk a Top Bunk bed possess for me. Warden Franks would not even allow me to discuss how I feared falling again and hitting my head and how I had difficulty climbing and coming down a Top Bunk bed because I could not reach with my legs as my height was a problem. Warden Franks stated, "What don't you understand about what I just said to to you, that I will not move you". I asked her even if she knew and saw that a Top Bunk bed posed a safety risk to my health. She stated, "I am not talking to you about this anymore. You will stay there until medical says otherwise". I responded, "Irregardless that I sustained a head injury", and she stated, "I'm not talking to you about this anymore". She then walked away. Later that day, Warden Nelson, Warden Franks, Major Williams and Ms. Williams from Classification held a meeting with all Protective Custody offenders individually regarding a new policy for us. At that time, Warden Nelson stated to me, "Saldivar, I just finish talking to your sister and I assured her and I assure you that I will take care of you and medical will take care of you". I then stated to her, "Warden, I need a bottom bunk bed because I cannot climb up or come down from a Top Bunk for I risk falling again". All the while Assistant Warden Franks kept shaking her head indicating No to what I was stating to Warden Nelson. As of YESTERDAY, I WAS still in a Top Bunk bed as nothing WAS being done for I HAD not seen a doctor nor HAD I been moved in order for me to be safe. I was given a pass from a nurse for me to sleep on the floor with my mattress. Even though, cell #5 is a bottom bunk bed and is WAS available. Last month, I filed a grievance against Assistant Warden Franks and Major Williams asking for an OIG

---

**I-127 Front** (Revised 9-1-2007)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix F

investigation against them for giving me a disciplinary case I argued was unproven by the facts. That both Wardens and Major Williams remain steadfast NOT to move me to a bottom bunk bed for safety reasons, speaks volumes of a form of a retaliation by them, towards me disregarding my head injury. The nurse, Ms. Reinacher, told me today that security does not need to wait for medical to decide if there is a safety risk to an offender. That security could move me if they wanted to. I have a right to be safe in prison, to be free from discrimination, free from cruel and unusual punishment, a right to medical care, bedding, clothing, food and free from retaliation. By ignoring these RIGHTS by prison officials, they are violating my rights guaranteed by the Texas Constitution and United States Constitution. Yesterday, 6/4/15, I was taken To Coryell Mem. Hosp. Where A CT Scan was done And was Diagnosed as a Concussion. I was given IV Benadryl and Reglan.

**Action Requested to resolve your Complaint.**

That this RETALIATION by Ranking Officials causing me to be unsafe in my current ~~housing~~ assignment AT Mountain View stop immediately.

Offender Signature: _Yolanda Salder_       Date: 6-5-15

**Grievance Response:**

```
At the time you were moved to a cell with an upper bunk, you did not have a medical
restriction of lower bunk only. On 6/4/15, you did receive a lower only restriciton, at
which time you were moved to a lower bunk. No staff misconduct occured.
```

Signature Authority: _____       Date: 6-26-15

If you are dissatisfied with the Step 1 response, you may submit a Step 2 (I-128) to the Unit Grievance Investigator within 15 days from the date of the Step 1 response. State the reason for appeal on the Step 2 Form.

**Returned because:    *Resubmit this form when corrections are made.**
- [ ] 1. Grievable time period has expired.
- [ ] 2. Submission in excess of 1 every 7 days. *
- [ ] 3. Originals not submitted. *
- [ ] 4. Inappropriate/Excessive attachments. *
- [ ] 5. No documented attempt at informal resolution. *
- [ ] 6. No requested relief is stated. *
- [ ] 7. Malicious use of vulgar, indecent, or physically threatening language. *
- [ ] 8. The issue presented is not grievable.
- [ ] 9. Redundant, Refer to grievance # _____
- [ ] 10. Illegible/Incomprehensible. *
- [ ] 11. Inappropriate. *

UGI Signature: _____
**I-127 Back** (Revised 9-1-2007)

**OFFICE USE ONLY**

Initial Submission       UGI Initials:_____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

**2nd Submission**       UGI Initials:_____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

**3rd Submission**       UGI Initials:_____

Grievance #: _____

Screening Criteria Used: _____

Date Recd from Offender: _____

Date Returned to Offender: _____

Appendix F



**Texas Department of Criminal Justice**

# STEP 2

**OFFENDER GRIEVANCE FORM**

Rud @ MV OCT 1 2 2015

OFFICE USE ONLY

Grievance #: 2015153771

UGI Recd Date: JUL 10 2015

HQ Recd Date: JUL 15 2015

Date Due: 8/14

Grievance Code: 804

Investigator ID #: J 2133

Extension Date: 9-18

Offender Name: YOLANDA SALDIVAR    TDCJ # 733126

Unit: Mountain View    Housing Assignment: E-Dorm#5

Unit where incident occurred: Mountain View

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

**Give reason for appeal (Be specific).** *I am dissatisfied with the response at Step 1 because…*

Warden Nelson again is being deceived by those who do the grievance investigations or is being deceitful. I complained to Warden Franks and Major Williams about my head injury and about this safety hazard a top bunk posed to me. They chose to ignore it. My head injury was of no concern to neither one of them and they preferred not to take any action. But rather ignored my pleas for help to avoid a harm that I eventually sustained. When a prison official (ie Warden or Major) sees and knows of a danger to an offender by law, he or she must take action, not turn the other way, nor wait if harm does occur in order to take action. Once the harm is done, (ie my head injury) explaining it should not be regarded. Yes, on 6/4/15 I was moved to a lower/bottom bunk but not because the Warden or Major took action. Dr. Burleson saw me after my symptoms after my head injury continued to affect me. It took 10 days before I saw any physician for my head injury.

**I-128 Front** (Revised 9-1-2007)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix G

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Offender Signature: _Yolanda Sadie_       Date: _7-8-15_

Grievance Response: Your grievance has been reviewed and noted. Investigation revealed this issue was appropriately addressed at the Step 1 Level. No further action is warranted by this office.

F. Fuster, Asst. Reg. Director   September 17, 2015

Signature Authority: _Fuster, ARD_       Date:

Returned because:   *Resubmit this form when corrections are made.

☐ 1. Grievable time period has expired.

☐ 2. Illegible/Incomprehensible. *

☐ 3. Originals not submitted. *

☐ 4. Inappropriate/Excessive attachments. *

☐ 5. Malicious use of vulgar, indecent, or physically threatening language.

☐ 6. Inappropriate. *

CGO Staff Signature: _____

**OFFICE USE ONLY**

Initial Submission    CGO Initials:_____

Date UGI Recd:_____

Date CGO Recd:_____

(check one)____Screened ____Improperly Submitted

Comments:_____

Date Returned to Offender:_____

2nd Submission    CGO Initials: _____

Date UGI Recd:_____

Date CGO Recd:_____

(check one)____Screened ____Improperly Submitted

Comments:_____

Date Returned to Offender:_____

3rd Submission    CGO Initials:_____

Date UGI Recd:_____

Date CGO Recd:_____

(check one)____Screened ____Improperly Submitted

Comments:_____

Date Returned to Offender:_____

I-128 Back (Revised 9-1-2007)

Appendix G